Finding no merit in the motion same will be overruled.

### On Second Motion for Rehearing.

HAWKINS, J. Appellant's attorneys requested permission to file and argue a second motion for rehearing, which was granted because the verdict carries the death penalty, and we were interested in being assured no error had been committed to the detriment of the accused. The motion filed and argument in support thereof by appellant's attorneys show a commendable zeal in behalf of their unfortunate client. No new matters are presented, but it is urged that we reached erroneous conclusions in our opinions already announced. The issues were considered at some length, both in the original opinion and the one delivered on rehearing. We are unable to agree with counsel that the views heretofore expressed are not sound.

Believing that we reached a correct disposition of the case, a further discussion would be of no aid, and would only express in other language what has already been said.

The second motion for rehearing is overruled

---

**BEAZLEY et al. v. McEVER.   (No. 8601.)**

(Court of Civil Appeals of Texas. Dallas. Feb. 18, 1922. Rehearing Denied March 18, 1922.)

**1. Exchange of property ⬤�could10—Third party's misrepresentations as to condition of automobile held not binding on defendant.**

Where plaintiff traded his automobile for one belonging to M., acting on representations by V. as to the condition of M.'s car; held, that the mere fact that M. referred plaintiff to V. as one acquainted with the qualities of M.'s car was not alone sufficient to bind him to V.'s misrepresentations.

**2. Livery stable and garage keepers ⬤⟶6—Delivery of automobile held delivery to person entitled thereto.**

Where plaintiff and M. traded automobiles, plaintiff giving M. a bill of sale, but refusing to deliver his automobile to M., and instead storing it in defendant's garage, from which it was procured surreptitiously by M. upon exhibiting the bill of sale, held, that delivery to M. was delivery to the owner precluding liability for such delivery on the part of defendant.

---

⬤⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**3. Evidence ⊕54—Inferences must be based on facts established.**

Inferences may arise only from facts established, and can never be made to subserve the primary function of evidence.

**4. Estoppel ⊕95 — Silent acquiescence in fraudulent misrepresentations of third party not binding in absence of knowledge of falsity.**

Where plaintiff and M. traded automobiles, plaintiff acting on the misrepresentations of a third party as to the condition of the machine which he desired to obtain, the rule that a party in interest may become liable for mere silent acquiescence in fraudulent misrepresentations of a third party is inapplicable; there being no evidence that M. acquiesced in the third party's fraudulent misrepresentations with knowledge of their falsity.

**5. Trial ⊕127—Evidence that garage keeper was protected by bond held error in action for failure to deliver car.**

In an action against a garage keeper for failure to deliver a car placed in his keeping, evidence on cross-examination that a bond for the defendant's protection had been given by a third party claiming the car *held* error.

Appeal from Dallas County Court; Dayton B. Steed, Judge.

Suit by J. N. McEver against E. M. Beazley and another. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

W. S. Pearson, of Denison, and Wolfe, Freeman & Wolfe, of Sherman, for appellants.

Wood, Jones & Wood, of Sherman, and J. W. Hassell, of Austin, for appellee.

HAMILTON, J. Heretofore at the present term of court we disposed of this case without a written opinion. This action was followed by a most insistent motion for rehearing, accompanied by motion for written opinion. In the light of these motions, we have given further careful consideration to the case, and have arrived at the conclusion that we should express in a written opinion the conviction into which the final deliberations bestowed upon the propositions presented have ripened.

The controversy grew out of an exchange of automobiles between appellant McCoin and appellee. The former traded the latter a Hupmobile for a Ford car, and paid $30 difference. Bills of sale were simultaneously executed and delivered by each of the respective parties to the other. The Hupmobile was in a garage for repairs at the time. Appellant McCoin had owned the Hupmobile but a day or two when the trade was made. He told appellee this, and also told him that he knew nothing whatever about automobiles, and, particularly, was unacquainted with that which he was proposing to trade. In the same connection he told appellee that G. B. Vest, in whose garage it then was, knew about it, and could give appellee information as to its condition, etc. Appellee talked with Vest before the trade was made and, apparently upon the faith of Vest's statements, he made the trade. Subsequent to the trade, and on the same date, he was told that the Hupmobile was worthless, and that Vest's representations were false. He was to deliver the Ford to McCoin the morning following the day of the trade. After the trade he was to take it to his home a short distance from Denison to get some extra equipment and return with it the next morning, as above stated and make delivery to McCoin. Appellee had already received the $30 difference. After receiving information to the effect that Vest's representations were false appellee concluded to renounce the trade, retain the Ford car, and return to McCoin the $30. He tendered back the $30, which McCoin declined to accept, and put the Ford automobile in appellant Beazley's garage, receiving from Beazley at the time a promise that it would not be delivered to anybody else. McCoin came to the garage in Beazley's absence, and, displaying the bill of sale from McEver to one of Beazley's employés, induced such employé to deliver the Ford car to him. McCoin took the Ford car across the state line into Oklahoma, and refused to return it to Beazley upon the latter's demand.

Suit was filed by appellee to recover damages against the appellant Beazley for conversion of the Ford automobile, and, in the alternative, for Beazley's carelessly and negligently delivering such automobile to a person not entitled to it after appellee had stored it in appellant's garage, such person to whom it was negligently delivered having converted it.

Appellant Beazley answered the suit, admitting that the Ford automobile had been delivered to his garage by McEver, but denying appellee's right to possession, and pleading delivery of it on his part to appellant W. H. McCoin, alleged by him to be the true owner and rightful possessor under a bill of sale, and also by actual sale and delivery by appellee to McCoin. Beazley pleaded that, if he committed any wrong in making delivery, then appellee contributed to the act by delivering to McCoin the bill of sale used as an instrumentality by McCoin to obtain delivery of the automobile from Beazley's employé in the absence of Beazley, and that McEver was accordingly precluded from any right of recovery.

Appellant McCoin voluntarily made himself a party defendant to the suit by proper pleadings, joining issue with appellee. The case was submitted to a jury upon special issues, and, based upon the answers of the jury, judgment was entered for appellee by

---

which he was awarded damages, interest, and costs of suit against the appellants, and in which appellant Beazley was awarded judgment in the same sum against appellant McCoin.

The cause was submitted to the jury upon nine questions, to which answers were made. The record contains evidence sufficient to sustain the answers rendered by the jury to all of the questions.

The eighth question submitted to the jury presents matter disclosed by the evidence which has a vital bearing upon the case, and the answer to which, sustained as it is by all the evidence, clearly renders the judgment of the court insupportable. Said question is as follows:

"If you believe that the witness G. B. Vest made to the plaintiff J. N. McEver any false representations as to the Hupmobile car, then you will answer this question: Did the defendant McCoin authorize Vest to make such misrepresentation?"

The answer was "No." This question presents no issue controverted in the evidence.

[1] There is no evidence in the record which remotely tends to disclose that McCoin made any misrepresentations to McEver or participated in any act of deception. His mere referring McEver to Vest, as a former owner of the Hupmobile, and as a person acquainted with its qualities, is not sufficient alone to bind McCoin to Vest's misrepresentations.

[2] The evidence of McEver himself contains absolutely nothing from which the conclusion may be drawn that McCoin, either directly or through any other person, authorized by him to speak for him, made any fraudulent representations to induce McEver to make the trade, and the only contention, of course, upon which McEver bases his right of possession and right to damages is that a fraud was perpetrated in the making of the contract which vitiated it and rendered it voidable at his instance. No other infirmity is suggested. Hence, if no deceit was practiced or participated in by McCoin, the title to the Ford automobile was in McCoin when Beazley's employé delivered it to him. And, in such circumstance, delivery to McCoin was delivery to the owner and person entitled to possession, which precluded liability against Beazley.

McEver's testimony is important in this connection, and is as follows:

"I reside in Grayson county, Tex., about five miles west of Denison. I am acquainted with W. H. McCoin. Some time in December, 1918, I met McCoin in Denison, Tex. I owned a Ford car, and McCoin proposed to trade a Hupmobile for my Ford. I asked him about his car, and what condition it was in. He told me that he did not know anything about an automobile, and had only owned this car two or three days, and was unable to tell me as to its condition. He said that after buying the Hup-mobile car he had started to drive it home, and in some manner had got it broke, and it was at that time in the shop for repairs. He said that it was in the shop of Mr. G. B. Vest, and that Mr. Vest could tell me all about it. We went over to the shop of Mr. Vest and saw the car. We talked about what it would cost to make the necessary repairs on the Hup car to put it in good condition. Mr. Vest said that he did not know just what it would cost, and would not know until he had torn it down. We discussed this matter at some length, and finally left the shop, and I went home. The next day I came to town and saw Mr. McCoin and he brought up the trade again. We went over to Vest's shop, and they said he was at home sick. We went out to his house and talked to Mr. Vest, and we again discussed what it would cost to repair the Hup car. Mr. Vest said it would cost between $25 and $50 to put it in first-class condition. Mr. McCoin proposed to give me $30 and his Hup car for my Ford. I finally told him I would trade with him, and would come back the next morning and deliver him the Ford car, and would bring some old casings which I had out at home. After leaving McCoin I went around to the defendant Beazley's garage to get some gasoline. The man who waited on me was working for Mr. Beazley; his name was Geo. Glaze. I told him to give me one gallon, and he asked me what was the matter that I just wanted one gallon, and stated that I usually had the tank filled. I told him that I had sold the car, or traded it, to Mr. McCoin for a Hupmobile, and simply wanted enough gas to take me out home and back, as I was to bring the car back next morning for delivery. This man told me about the Hup car. Vest had told me that he had owned this car and had driven it to Colorado the summer before; that it was in fine condition, and that he had driven it up Pikes Peak; that he was the only man who had ever driven the car till he let McCoin have it. I learned when I went to get the gasoline from the man who waited on me that this was not true, that Beazley had bought this car secondhand and in very bad condition, and that it was an old, worn-out car. I also ascertained from him that what Vest told me about the car was untrue. Vest had told me that the Hupmobile was a 1915 model; that the casings on it were practically new, and were worth and actually cost $108, which was the wholesale price for said casings. He said the car was a good and serviceable car except for minor repairs to be made thereon, which would not exceed $30 to $50; that when said repairs were made it would be in good condition and would render good and efficient service. McCoin had told me that Vest could tell me about the car, and I relied upon these representations. After getting the gasoline I went on home, and the next morning I came back and put the car in the garage of the defendant Beazley. I told him I had made a trade with McCoin, but that he had misrepresented matters, and that I was not going to let him have the car. I asked Beazley if he would keep the car for me, and he said he would. He said he would fix it so that no one could get it but me. He took a card which had duplicate numbers on it, and one part of this card was attached to the car and the other bearing the

same number was delivered to me. He told me no one could get the car without presenting the ticket, and not to lose the ticket, for then I couldn't get it myself. I went on away, intending to see McCoin, and tell him what I had learned about the Hup car. I went out on the street at the National Bank of Denison where I was to meet him at 10 o'clock the next morning, but didn't find him. I waited around there till nearly 12 o'clock, when I saw McCoin's son, whom I asked where his father was. He said at Red River bridge waiting for him to bring the car. I told the boy he could not get the car on account of the misrepresentations. Later on Beazley came to me on the street and seemed to be very much excited, and told me that the damned old son of a bitch had stolen the car; that he had come to the garage and got it from one of his employés while he was absent."

[3] From the foregoing it clearly appears that McEver makes no statement in his evidence tending to show that McCoin practiced or participated in any fraud or deceit. All the other testimony bearing upon this question positively asserts that no such fraud was practiced or participated in by McCoin. A mere inference that misrepresentations Vest made to McEver were inspired or participated in by McCoin for the purpose of perpetrating a fraud upon McEver cannot be indulged. Inferences may be drawn from actual facts proved. They can arise only from facts established. They can never be made to subserve the primary function of evidence. There must be at least some evidence fairly pointing to the conclusion that McCoin was guilty of fraudulent acts before such conclusion can arise, and there is absolutely no such evidence in the record.

[4] Accordingly, since the transaction had between McEver and McCoin resulted in a conveyance of the title of the Ford automobile to McCoin unless McCoin defrauded and deceived McEver, the evidence completely fails to sustain the judgment of the court. Whatever fraudulent misrepresentations were made by Vest, there is nothing in the record which can be construed as proof that they were made as McCoin's agent, or that McCoin authorized Vest to make them. Neither does the proof contain any basis for the conclusion that McCoin acquiesced in Vest's fraudulent misrepresentations with knowledge that they were false and fraud-

ulent. Hence the rule that a party in interest may become liable by mere silent acquiescence for the fraudulent misrepresentations of a third party has no application. Foix v. Moeller et al. (Tex. Civ. App.) 159 S. W. 1048; 20 Cyc. 80.

The evidence established that, after Beazley learned that McCoin had gone to his garage and obtained possession of the Ford automobile without his knowledge and, consent, and had taken it into Oklahoma, he called upon McCoin in Oklahoma and demanded return of the automobile. With this demand McCoin refused to comply, but promised to come to Denison and make some satisfactory arrangement with Beazley with reference to the matter. It seems that McCoin, in pursuit of this promise, did return to Denison and executed an indemnity bond to Beazley.

Upon the trial of the case Beazley testified substantially to the above facts. Then, upon cross-examination, over his objection, appellee was permitted to elicit from Beazley proof that the bond had been executed by McCoin. Counsel for McEver also argued before the jury the fact that such bond was executed and that Beazley would be protected in the event judgment were rendered against him in favor of appellee. This argument was made over the objection of appellant Beazley.

[5] We think there can be no doubt that under the authorities this part of the procedure below was also error. We know of no circumstance more surely calculated to cause a jury to render a verdict against a litigant without regard to the sufficiency of the evidence against him than to be assured by such proof as this that the person against whom such verdict is sought is amply protected by bondsmen who have agreed to hold him harmless in the event a judgment should be recovered against him. Lone Star Brewing Co. v. Voith (Tex. Civ. App.) 84 S. W. 1100; Levinski v. Cooper (Tex. Civ. App.) 142 S. W. 959; Harry Bros. v. Brady (Tex. Civ. App.) 86 S. W. 615.

The above-mentioned errors clearly inhering in the proceedings below, and the authorities thoroughly supporting the view we have expressed with reference to them, there is no alternative except to reverse and remand the cause for further proceedings.

Reversed and remanded.