John L. ROBERTSON and Sibling A, Inc., Appellants/Cross–Appellees,

v.

ADJ PARTNERSHIP, LTD. and Virginia Henderson Adams, Appellees/Cross–Appellants.

No. 09–05–462 CV.

Court of Appeals of Texas, Beaumont.

Sept. 28, 2006.

John H. Seale, Seale, Stover & Bisbey, Jasper, for appellants.

Robert T. Cain, Jr., Judi C. Wells, Zeleskey, Cornelius, Hallmark, Roper & Hicks, Lufkin, for appellees.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

John L. Robertson and Sibling A, Inc. appeal the jury verdict in a suit for fraud and abetting a breach of fiduciary duty. In fourteen issues, they challenge the legal and factual sufficiency of the jury's findings on damages, on breach of fiduciary duty, and fraud. In addition, they contend any recovery against them is barred by co-defendant Bill McGraw's settlement with the plaintiffs. In a cross-appeal, ADJ Partnership, Ltd. and Virginia Henderson Adams challenge the denial of prejudgment interest. We affirm.

### Relationships

McGraw and Adams are partners and tenants-in-common of extensive mineral interests. Virginia Adams and McGraw's wife Katharine are sisters and co-tenants of property inherited from their father, David M. Henderson. In addition, Adams and McGraw are co-tenants in a 5,000 acre oil and gas lease by virtue of an assignment in 1986 from Henderson to Bill McGraw and Adam's husband, Abel. McGraw, a lawyer, worked in the family's businesses and took care of Henderson's legal matters. The family maintained a tradition of keeping their mineral interests together. Katharine and Virginia are co-executrices of their parents' estates, Henderson, who died in 1988, and Ramona Henderson, who died in 1991. McGraw

acted as counsel of record in the probate proceedings for both estates until Adams and ADJ filed this suit. McGraw also took care of Abel Adams's legal business until his death in 1992. As the result of a disagreement over a $54,000.00 bill submitted by McGraw for legal services rendered in connection with the Henderson estate, in 1990, Adams demanded that McGraw notify her in advance of the amount of any legal fee to be charged. Despite the questioning of the legal fee associated with her father's estate, McGraw continued to handle certain real estate and mineral transactions after Adams was widowed.

McGraw is also one of seven general partners in the Henderson Family Partnership, a limited partnership formed in 1978 and in which the McGraws, Adams, and several Henderson cousins share an interest. Adams and ADJ are beneficial owners of the Henderson Family Partnership.

McGraw deposited and distributed the money for the assignments of the mineral leases involved in this suit through his escrow account. He maintained the records of the division of income from their shared holdings.

Out of many transactions involving Adams and the McGraws, seven transactions are at issue in this case. Six transactions related to a single piece of property and were referred to as "the Bridges Leases" by the litigants; that property was owned one-half by Adams and one-half by the McGraws. A seventh transaction concerned property consisting of 300 acres in San Augustine County. Half the minerals on the 300 acre tract were owned by the Henderson Family Partnership, which included Adams, the McGraws, and some cousins; one-quarter was owned by Adams, and one-quarter was owned by the McGraws.

John L. Robertson is a petroleum landman. Robertson has known McGraw since 1990. Robertson also knows Adams and leased mineral interests from her in the past. At the time of the transactions at issue, Robertson was soliciting leases for Marathon Oil Company.

Robertson had McGraw incorporate Sibling "A" in 1993. Although his name does not appear on the Articles, Robertson testified he is the sole owner of Sibling "A". Robertson and McGraw have other business deals between them, but the only legal matter in which McGraw has ever represented Robertson was the simultaneous incorporation of Sibling "A" and two other corporations.[1] Robertson used Sibling "A" as a device to conceal his name from the record of a transaction. McGraw is one of the initial directors. Except for a banking resolution that names McGraw and Robertson as authorized officers, the incorporation documents of Sibling "A" were not completed or executed. The corporation never issued any shares. McGraw is the president of Sibling "A". Robertson is the sole signatory on the corporation's bank account. To Robertson's recollection, the only leases owned by Sibling "A" are the leases involved in this lawsuit.

When working under the direction of Marathon, Wayland Crawley acted as Robertson's supervisor. After being assigned a designated area and the maximum expenditure per acre, Crawley would contact the broker-in this case, Robertson-to pursue leases in the area and give the broker authority for the lease terms. Crawley paid the broker a daily wage plus mileage

---

1. The other corporations are Sibling "B", which Robertson testified he chartered but never used, and PLE Corporation, a company Robertson often uses to acquire oil and gas leases for various clients who want to conceal their involvement.

and a per diem for food. The broker would obtain the lease and submit to Crawley the lease and a report of the owners, fractional interests, amount paid, and lease terms.

Crawley testified that Robertson gave him money for helping him sell some leases. Robertson testified that he paid Crawley a commission for helping him sell a lease. Robertson suggested that Crawley made it appear that Marathon was interested in a lease when it actually was not. Some of the money was paid to Crawley's teen-aged daughter, who did nothing for the money.

### Transactions

McGraw approached Adams about producing some income from their jointly owned properties. Under the terms of Henderson's lease with the original owners, McGraw and Adams were paying $5,124 in annual rental on the Bridges leases in order to prevent the expiration of the lease and their return. McGraw testified that he decided he would be willing to take $50 per acre and the difference between a 1/8th and a 1/6th royalty and approached Robertson about taking an assignment. McGraw told Robertson that anything he got over that would be Robertson's fee or commission. Robertson agreed to a five-year assignment provided they made the assignment to Sibling "A". Then McGraw approached Adams and she agreed to assign the lease to Sibling "A". McGraw did not tell Adams that he served as president of Sibling "A".

In the first assignment, dated July 12, 1999, Adams and the McGraws conveyed 212 acres out of the Bridges leases. They agreed to consideration of $50.00 per acre bonus and the difference between a 1/8th and a 1/6th royalty. Adams signed the document at McGraw's office. The McGraws' and Adams's signatures are no-

tarized by McGraw's secretary. On July 12, 1999, Robertson executed a sight draft in the amount of $15,900.00 on the account of Marathon and to the attention of Wayland Crawley. Three days later, acting in his capacity as president of Sibling "A", McGraw assigned the lease to Marathon. Sibling "A" received a $75.00 per acre bonus and reserved an overriding royalty. On August 3, 1999, McGraw deposited $15,900.00 into his escrow account and issued checks in the following amounts: $4,770.00 to ADJ (the equivalent of $45.00 per acre), $7,950.00 jointly to Bill and Katharine McGraw, and $3,180.00 to "CASH"-which McGraw gave to Robertson. McGraw received the funds at Robertson's request and distributed the funds in the manner and in the amounts directed by Robertson. Robertson's intent was for McGraw to receive his entire interest and for McGraw and Robertson to split the profit Sibling "A" made off of Adams. McGraw did not tell Adams that he received more than she did for the same interest, and Robertson and McGraw both admitted there was no way she could have discovered that information.

On October 12, 1999, the McGraws executed an oil and gas lease directly to Marathon. The lease concerned 300 acres of land in the William Roberts Survey in San Augustine County. Robertson signed the sight draft and the funds did not pass through either Sibling "A" or McGraw's escrow account. McGraw received $100.00 per acre bonus and a one-fifth royalty. On the same day, ADJ and the Henderson Family Partnership executed separate leases conveying their interests in the same property to Sibling "A". According to McGraw, he told Adams "what the deal was" and "she'd get $75 an acre." McGraw's secretary acknowledged Adams's signature for ADJ on the ADJ contract. McGraw's capacity as president

of Sibling "A" is filled in by hand and his signature bears a separate acknowledgment notarized by Robertson. The information about McGraw was not on the document when Adams signed it. Also on October 12, 1999, McGraw signed the Henderson Family Partnership lease as a general partner of the Henderson Family Partnership. His signature, along with that of three other general partners, is notarized by McGraw's secretary. On the same day, McGraw signed the lease, as president of Sibling "A", but Robertson notarized that signature and McGraw's identity is added in ink to a blank space. On October 19, 1999, McGraw, as president of Sibling "A", assigned the leases to Marathon. As in all the transactions at issue in this case, Sibling "A" retained an overriding royalty. McGraw obtained a one-fifth royalty while the partnership and ADJ retained a 3/16ths royalty. Sibling "A" retained a 1/5th overriding royalty. Robertson notarized McGraw's signature with respect to Sibling "A" 's assignment. That same day, Robertson signed a sight draft on the account of Marathon for $22,500.00. Wayland Crawley's name appears on the draft and, according to Robertson, was the landman with Marathon. McGraw deposited the check in First State Bank. A draft dated October 14, 1999, signed by an unidentified person and issued on a Sibling "A" account with First State Bank, paid the partnership $11,250.00 for its interest in 150 of the 300 acres and paid ADJ $5,625.00 for its interest in 75 acres of the 300 acres. A November 5, 1999 check from McGraw's escrow account covered the Henderson Family Partnership draft. Three other checks were issued out of McGraw's escrow account the same day, they paid $2,312.50 to Robertson for "1/2 profit on Marathon Lease in Sabine County, A–50, Roberts Survey, 300 acres," $2,312.50 to McGraw for "1/2 profit on Marathon

Lease in Sabine County, A–50, Roberts Survey, 300 acres," and $1,000.00 to "CASH" for "Waylon commission, Marathon Lease, A–50, Roberts Survey, Sabine County, 300 acres." Robertson testified that the checks were signed by McGraw at Robertson's instruction, and that the $1,000.00 was paid to Wayland Crawley. These leases were assigned through Crawley. When Robertson negotiated his check, the reference to "commission" had been redacted. Robertson testified that he could have removed the reference, and admitted that he would have done so "to not show what I got the money for." Robertson agreed "it wouldn't look too good" for either Robertson or Crawley, as he was soliciting leases for Marathon at the time.

On November 8, 1999, Adams and the McGraws executed an oil and gas lease assignment to Sibling "A" that consisted of a series of leases referred to by the parties as the "Bridges leases." Two days later, acting in his capacity as president of Sibling "A", McGraw assigned approximately 540 acres out of the Bridges leases to Marathon. A $54,031.00 draft payable to McGraw, as agent for Sibling "A", was dated November 8, 1999, and signed by Robertson on the account of Marathon. McGraw deposited the draft into his escrow account at First State Bank. A $13,507.75 draft with an unidentified signature was issued to Adams. The money from the assignment to Marathon was disbursed in five checks from McGraw's escrow account: (1) a $13,507.75 check, payable to First State Bank, to cover Adams' draft; (2) a $27,015.50 check, payable to McGraw; (3) a $4,502.59 check, payable to Robertson; (4) a $4,502.58 check, payable to McGraw; and (5) a $4,502.58 check, payable to Wayland Crawley's daughter. The payment to Crawley's daughter was Robertson's means of "cutting Wayland in

on the deal." When deposited, the reference to the lease had been redacted from the check to Crawley's daughter. McGraw designated this payment as "Rents" in a report to the Internal Revenue Service.

On February 8, 2000, McGraw executed another assignment, covering approximately 1,500 acres out of the Bridges leases, this time from Sibling "A" to CG Operating, Inc. Robertson sent a memorandum to CG Operating in which he provided McGraw's social security number and instructed the recipient to make the check out to McGraw. The recipient of the memorandum executed a $191,400.00 check to McGraw. McGraw deposited the check in his escrow account then distributed the proceeds as follows: $19,937.50 to Adams, $19,937.50 to the Adams' marital deduction trust, $119,226.25 to McGraw, $23,526.25 to Robertson, and $8,772.50 to "CASH." McGraw endorsed the $8,772.50 check. Robertson testified that he probably personally delivered this money to Crawley. According to Robertson, McGraw made much more than Adams because Robertson "cut him in on my part of the deal."

On February 17, 2000, McGraw presented a proposition to El Paso Production Company regarding 1,783.75 acres out of the Bridges leases. A representative of El Paso electronically transmitted a letter agreement to Robertson that they printed on McGraw's law office letterhead. Adams did not know that they received $124.00 per acre bonus. Sibling "A" received $221,185.00 from El Paso Production Company on March 27, 2000. McGraw deposited the money in his escrow account and distributed the money as follows: $24,080.63 to Adams, $24,080.62 to the Adams' marital deduction trust, $137,348.74 to McGraw, $26,756.26 to Robertson, and $8,918.75 to "CASH." Once again, McGraw cashed the last check and Robertson gave Crawley the money, probably by hand delivery. Robertson explained that "I paid him [McGraw] full share, plus cut him [in] on my profit."

A letter agreement, dated January 26, 2001 between an agent for Range Production I, L.P. and McGraw, as president of Sibling "A", covered 372.45 acres out of the Bridges leases and an additional 48.61 acre tract that McGraw owned individually. That same day McGraw executed an assignment on behalf of Sibling "A" to Range Production. A few days later, checks were issued in the amount of $7,534.55 to McGraw, for his individual interest, and $57,729.75 to Sibling "A". McGraw deposited both checks into an account in the McGraws' names. McGraw then wrote Robertson a check for $17,636.94. Apparently, McGraw's share remained in the account. Robertson testified that when he got the money in 2001, he gave McGraw the figures, including the amount to pay Adams, and told McGraw to issue a check to Adams. Nevertheless, Adams received her check for this assignment after she filed the lawsuit.

On November 16, 2001, McGraw executed the final Sibling "A" assignment (this time to U.S. Producing Properties, Inc.) on 110 acres out of the Bridges leases. At Robertson's request, U.S. Producing issued a $5,500.00 check directly to Robertson and a $5,500.00 check to Sibling "A". Out of the amount received by Sibling "A", checks were issued to the McGraws and to ADJ in the amount of $1,833.33 each. A memorandum explained that the McGraws and ADJ each owned 1/2 of 73.33 net acres out of the 110 acres' assignment. Robertson testified that Sibling "A" had a bank account at that time and that he was probably the only person on the signature card. Robertson used the remaining funds in the account to purchase his house, then closed the account.

Robertson admitted that he shares Sibling "A"'s royalties with McGraw. Robertson and McGraw jointly hold other mineral interests, but only property also owned by Adams was funneled through Sibling "A". The leases involved in the suit are the only ones ever held by Sibling "A".

## Issues

The appellants' first three issues challenge the legal sufficiency of the evidence regarding damages, and the requirement to convey their overriding royalty interest to appellees. Issues four through nine challenge the legal and factual sufficiency of the evidence of a relationship of trust and confidence between McGraw and Adams, and of Robertson's knowledge of that relationship. Issues ten through thirteen challenge the legal and factual sufficiency of the evidence supporting the jury's findings regarding fraud. Issue fourteen contends the appellees' settlement with McGraw prevents recovery against the appellants. The sole issue raised by Adams and ADJ contends that they are entitled to recover prejudgment interest. For convenience, we will address the issues out of order.

■ When analyzing a legal sufficiency claim, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005). The evidence is legally sufficient if it enables reasonable and fairminded people to reach the verdict under review. *Id.* at 827. In reviewing a factual sufficiency point of error, we consider all of the evidence, and may set aside the verdict only if the evidence is so against the great weight and preponderance of the evidence that it is clearly wrong and un-

just. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001).

## Fiduciary Duty

■ The jury found a relationship of trust existed between McGraw and the appellees. The appellants argue that the legal work McGraw performed for Adams, which included handling her parents' estates, her husband's legal business before his death, and a few real estate and mineral transactions after Adams was widowed, is not a substantial enough connection for there to have been a relationship of trust between them sufficient to give rise to a fiduciary relationship in the transactions at issue. Although a fiduciary duty is not lightly imposed, we conclude the evidence is sufficient to support the jury's answer regarding McGraw's status as a fiduciary.

■ A fiduciary duty arises as a matter of law in formal attorney-client and trustee relationships. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex.2005). To the extent McGraw provided legal services to Adams, such a formal fiduciary relationship existed. Likewise, to the extent McGraw acted as escrow agent, a formal duty of disclosure arose. *See City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664–65 (Tex.1969). It is not clear from this record whether McGraw prepared the documents executed in these transactions. On all but one of the transactions, he ran the funds through his law office escrow account. Even in the absence of a formal fiduciary relationship, an informal fiduciary duty arises in some personal relationships. *See Meyer*, 167 S.W.3d at 331. Where a business transaction is involved, "the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex.1998). In this case, McGraw maintained a long-term

formal fiduciary relationship with the members of the Henderson family. From the amount he charged for his work on the Henderson estate, it appears that work was extensive. The family-McGraw in-cluded-had a tradition of keeping the fami-ly's mineral interests together in order to benefit from their combined bargaining power. For many years, McGraw joined in business ventures with his father-in-law, his brother-in-law, and his sister-in-law for their mutual benefit. McGraw provided legal representation to Adams and other Henderson family members in transactions in which he also had a personal financial interest. Considering their close family relationship, their preexisting attorney-client relationship, and their history of joint business pursuits, a reasonable jury could conclude that Adams was justified in trusting McGraw to be transparent in his dealings with her.

For evidence that Adams did not trust McGraw, the appellants rely upon a letter Adams wrote to McGraw in which she demanded that in the future he notify her in advance of anticipated legal fees. The jury could conclude that, far from estab-lishing a lack of trust between the two, the letter demonstrates Adams' intention to continue allowing McGraw to act as her attorney as representative of her father's estate, provided he disclose his fees in advance. As illustrated by a letter McGraw wrote to Adams' counsel in 2001, it is evident that McGraw expected the family to trust him and that he held him-self out as being responsible to them. The letter referred to McGraw's promise that he made to Henderson, on Henderson's death bed, invoking the promise made by Henderson to Henderson's own father, "that I would, as he did, look after the family properties to the benefit of all con-cerns. This I have done."

In *Meyer v. Cathey*, the parties were not relatives, and while they enjoyed a long-standing friendship and worked on several projects together, the prior agreements governing those projects expressly disa-vowed the creation of any special relation-ship. *See Meyer*, 167 S.W.3d at 331. McGraw, on the other hand, invoked the confidence arising out of the family rela-tionship when others questioned his ac-tions. The evidence of a pattern of reli-ance on both the trust attendant with a family relationship and the trust arising in the attorney-client relationship, provides more than a scintilla of evidence to support the jury's finding of a relationship of trust and confidence between McGraw and Adams in this case.

The appellants' brief states that, in the alternative, the jury's answer is against the great weight and preponderance of the evidence. They supply no additional argu-ment or authority to explain why the evi-dence they discuss in the brief is factually insufficient. In the record, we find testi-mony from McGraw that he felt they had no attorney-client relationship whatsoever. Adams did not rely on McGraw exclusively for legal advice and she hired other law-yers over the years. Nonetheless, Adams did not have independent legal counsel in any of the transactions at issue, and McGraw made it appear that their inter-ests were identical. We hold the jury's finding on the question of a fiduciary rela-tionship between McGraw and Adams is supported by evidence that is both legally and factually sufficient.

The jury question on breach of fiduciary duty was conditioned upon an affirmative finding to the jury question on the exis-tence of a relationship of trust and confi-dence. The appellants challenge the jury's finding that McGraw failed to comply with his fiduciary duty to the appellees on the grounds that the evidence is insufficient to

support the existence of a relationship of trust and confidence. This argument, and the similar argument addressed to the jury question regarding the appellants' involvement in the breach, fails because we have found sufficient evidence in the record for the jury's finding on the predicate question.

■ The appellants also argue the evidence is legally and factually insufficient to support the jury's finding that Sibling "A" and Robertson aided and abetted McGraw in the breach of his fiduciary duty to Adams and ADJ. They claim there is no evidence that Robertson had any knowledge of any relationship between McGraw and Adams other than their family relationship, or that Robertson had any knowledge that Adams trusted or had confidence in McGraw. McGraw is the President of Sibling "A" and acted in his official capacity in the course of these transactions. Robertson had known McGraw since 1990, hired McGraw to incorporate Sibling "A", and knew Adams and her husband personally. Robertson admitted the transactions were structured according to his instructions that included bringing the checks to McGraw and dictating the distribution of those funds out of McGraw's escrow account. The procedures Robertson implemented were peculiar to these transactions. Robertson knew McGraw and Adams co-owned undivided interests in the property at issue. Robertson never spoke to Adams, but negotiated the deal with Adams through McGraw. Robertson was certainly aware that McGraw was acting on behalf of Adams when he communicated that "they" would take $50.00 an acre. Of course, Robertson was aware that McGraw was actually being paid far more than that in the series of transactions at issue in this appeal. Robertson admitted he "made some money" off of Adams on the transactions. Although Robertson claims he is the sole owner of Sibling "A" and that he merely shared some of the profits with McGraw from the Sibling "A" transactions because McGraw had included Robertson in some unidentified past deals, the jury could reasonably reject Robertson's explanation and instead conclude that Robertson knowingly shared his profits with McGraw because he knew McGraw deceived Adams into assigning her interest to Sibling "A" for far less than the consideration received by McGraw. The subterfuge would not have been possible had Robertson and Sibling "A" not supplied McGraw with the means to conceal his true participation in the transactions. We hold the jury's answer to the question regarding whether the appellants aided and abetted the breach of fiduciary duty is supported by legally and factually sufficient evidence.

### Fraud

Robertson and Sibling "A" challenge the legal and factual sufficiency of the evidence supporting the jury's findings that they committed fraud against Adams and ADJ and that the appellants secured the execution of the assignments and leases by deception. Because Robertson did not speak with Adams when the assignments and leases were made, appellants argue there is no evidence that Robertson induced Adams to sign the documents and no evidence that he deceived her. The appellants also argue that Robertson had no duty to tell Adams that he could resell the leases for a profit. They do not challenge the jury's finding that McGraw committed fraud or secured the execution of the assignments and leases by deception. The appellants cite no supporting authority for their arguments, but appear to contend that a claim of fraudulent inducement requires direct communication between the plaintiff and each defendant.

"Texas case law has held that each party to a fraudulent scheme is responsible for the acts of the other participants done in furtherance of the scheme and liable for fraud." *In re Arthur Andersen LLP,* 121 S.W.3d 471, 481 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding). A party may be held liable for fraud because he participated in the transaction and reaped the benefits. *See id.* In this case, Robertson orchestrated the transactions; the fact that the fraudulent misrepresentations were communicated through McGraw does not alleviate Robertson's responsibility.

The record reflects that Robertson knowingly participated in the scheme to induce Adams to convey her mineral interests, and that he shared in the profits of the fraud. Robertson testified that the transactions were his deal and he merely "cut in" McGraw and Crawley as a gift. Robertson admitted he structured the transaction to conceal his identity. The jury could have reasonably concluded that the documents were deliberately drafted to conceal McGraw's identity as president of Sibling "A" as well and accordingly, Robertson actively participated in the deception. For instance, when McGraw signed the October 1999 oil and gas lease as grantor, his name was typeset into the document; the single acknowledgment indicates he signed the document at the same time as Adams. However, when he signed the same document as grantee, in his capacity as president of Sibling "A", his name was added by hand and signed after he and Adams executed the document as grantors. Additionally, Robertson, not McGraw's secretary, acknowledged the execution of McGraw's signature as president of Sibling "A". The jury could also have considered the fact that Robertson and McGraw repeated the pattern of deceptive documentation and concluded that the deception was neither coincidental nor inadvertent. Nothing in the documents provided to Adams reveals that her equal co-tenant received greater consideration for the same interest in their property. Far from denying that he represented to Adams that he was selling his interest for the same price she sold her interest for, at trial, McGraw insisted the representation was the truth. Considering McGraw actually received almost three times more than Adams for the same interests, the jury could find McGraw's testimony to be incredible and disregard it. We hold that the jury's answers to the questions inquiring of securing documents by deception and fraud by Robertson and Sibling "A" are supported by evidence that is both legally and factually sufficient to support the verdict.

### Damages

The jury found actual damages in the amount of $50,500.00 and the judgment orders the appellants to convey to Adams the overriding royalty interest retained in the July 1999 and November 1999 conveyances to Marathon. Robertson and Sibling "A" argue that the evidence of how much the oil companies actually paid for the leases is no evidence of how much Adams would have received on her own. The appellants also challenge the ordered conveyance because no oil company would pay a royalty and an overriding royalty to the same party. We reject the appellants' arguments on these issues because disgorgement of profits has long been recognized as an appropriate remedy for fraud and for breach of fiduciary duty. *See Burrow v. Arce,* 997 S.W.2d 229, 239–40 (Tex.1999) (breach of fiduciary duty); *Smith v. Smith,* 213 S.W. 273, 277 (Tex.Civ.App.-Austin 1919, writ ref'd) (fraud). None of the cases cited by the appellants involve breach of fiduciary duty or fraud. *See Taub v. Houston Pipeline Co.,* 75 S.W.3d 606, 616 (Tex.App.-Texar-

kana 2002, pet. denied) (breach of contract); *Bellatti v. Holland Mortgage & Inv. Corp.*, 838 S.W.2d 261, 263 (Tex.App.-Texarkana 1992, no writ) (commercial negligence); *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.) (negligence).

▮ The measure of damages for fraud may either consist of the difference between the value paid and the value received (out-of-pocket) or the difference between the value parted with and the value received (benefit-of-the-bargain). *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998). McGraw received all of his share of each of the interests he and Adams sold to Sibling "A", then McGraw and Robertson split the overriding royalties Sibling "A" received in the transaction with the oil companies. For instance, in the July 1999 transaction, Adams received $4,770.00, Robertson received $3,180.00, and McGraw received $7,950.00. When they divided the proceeds from the October 1999 transaction from Sibling "A" to Marathon, the checks to McGraw and Robertson read "1/2 profit" on the Marathon Lease. In all, Robertson received approximately $101,000.00, either for himself or for "commissions" passed on to Crawley. The jury found the appellees' actual damages to be $50,500.00 or half of the amount Robertson realized as his profit on the deals. In light of the evidence that Robertson "cut in" McGraw by giving him half of what he made, the jury could have concluded that Adams's damages were half of the amount Robertson received.

▮ Next, the appellants contend that the jury finding that Adams agreed to lease her interest for $50.00 per acre, combined with the jury's failure to find that Sibling "A" or Robertson intentionally misapplied the mineral interests in a manner that involved substantial risk of loss to Adams, entitles them to a take nothing judgment. The question on which the jury failed to find for the plaintiff relates to exemplary damages for acts constituting criminal fraud, not to liability or to actual damages for breach of contract, breach of fiduciary duty, or common law fraud. *See* State Bar of Tex., Texas Pattern Jury Charges PJC 110.41 (Supp.2005). Adams admitted she agreed to take $50.00 per acre for her interest, but claimed her agreement was induced by the appellants' fraudulent conduct. The jury's findings on fraud and on the existence of a confidential relationship support the judgment notwithstanding the jury's negative answers to questions relating to breach of contract and criminal fraud. The argument presented during the hearing on the motion to enter judgment, conducted six weeks after the trial concluded, does not preserve error here regarding the jury finding. *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 867 (Tex.App.-Austin 2006, pet. dism'd by agrm't).

### One Satisfaction

▮ Finally, the appellants invoke the "one satisfaction rule" as a bar to any recovery on this judgment. "Under the one satisfaction rule, the nonsettling defendant may only claim a credit based on the damages for which all tortfeasors are jointly liable." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex.2000). The jury charge expressly limited the damages question to sums received by Robertson or Sibling "A" and expressly excluded sums paid by Robertson or Sibling "A" to McGraw. Nothing in the record indicates McGraw and the appellants are jointly liable for the damages awarded by the jury in this case.

### Prejudgment Interest

▮ In a single cross-point, Adams and ADJ contend the trial court erred in

refusing to award prejudgment interest calculated from the date they filed suit. The appellants suggest long-standing precedent supports awarding prejudgment interest in cases involving breach of fiduciary duty and fraud. *See Anderson v. Armstrong,* 132 Tex. 122, 120 S.W.2d 444, 450 (1938) (breach of fiduciary duty); *Texas Commerce Bank v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 84 (Tex.App.-Corpus Christi 1993, writ denied), *overruled on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529–30 (Tex.1998) (fraud). In the absence of a statute requiring an award of prejudgment interest, the decision to award prejudgment interest is left to the trial court's discretion. *J.C. Penney Life Ins. Co. v. Heinrich,* 32 S.W.3d 280, 289 (Tex.App.-San Antonio 2000, pet. denied). The purpose of prejudgment interest is to encourage settlement and to remove incentives for delay. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529 (Tex.1998). The appellate record does not reveal why the case did not go to trial for over two years after the filing of the original petition. Under the facts of this case, we cannot say that the trial court abused its discretion in declining to award prejudgment interest.

We overrule issues one through fourteen, raised by John L. Robertson and Sibling "A", Inc., in their appeal, and we overrule the issue raised on cross-appeal by Virginia Henderson Adams and ADJ Partnership, Ltd. The judgment is affirmed. Judgment is rendered against the sureties on the appellants' supersedeas bond for the performance of the judgment and for costs rendered against the appellants. Tex.R.App. P. 43.5.

AFFIRMED.