**Opinion filed April 20, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00183-CV

_____

## BAXSTO, LLC, Appellant

## V.

## ROXO ENERGY COMPANY, LLC; ROXO ENERGY, LLC; REC MINERALS, LLC; ROXO FW, LLC; AND VORTUS INVESTMENT ADVISORS, LLC, Appellees

**On Appeal from the 118th District Court**
**Howard County, Texas**
**Trial Court Cause No. 53632**

## O P I N I O N

This appeal concerns alleged fraudulent conduct in the lease and subsequent sale of mineral interests located in Howard and Borden Counties. Appellant, Baxsto, LLC, the owner of the mineral interests at the time that the agreements to be

discussed below were executed, filed suit against Appellees, Roxo Energy Company, LLC; Roxo Energy, LLC[1]; Roxo FW, LLC (Roxo FW); Vortus Investment Advisors, LLC (Vortus); and REC Minerals, LLC (REC), alleging that, based on representations made by Appellees, it was defrauded and induced to "lock itself" into a lease and then later sell its mineral interests to Appellees for a lower, reduced price. After extensive discovery, Appellees filed combined no-evidence and traditional motions for summary judgment in which they challenged the fraud claims that Baxsto asserted against them. The trial court granted the motions and rendered a take-nothing judgment against Baxsto.

In six issues, Baxsto contends that the trial court erred when it granted Appellees' motions. For the reasons detailed below, we reverse and remand.

## I. *Factual Background*

Baxsto is solely owned by Ashley Stout. Cole Stout, Ashley's husband, managed the day-to-day operations and acted as an agent of Baxsto during the relevant time period. Prior to the transactions that are the focus of this appeal, Baxsto owned undivided mineral interests in Howard and Borden Counties.

Todd Fitzgerald, Chief Executive Officer of Roxo, contacted Baxsto through intermediaries for the purpose of discussing Roxo's leasing and potentially buying Baxsto's mineral interests. At the time, Vortus considered investing in Roxo to advance the objective of gaining operational control of mineral interests in the area.

According to the summary judgment record, in October 2016, Baxsto and Roxo began negotiating a lease and the potential sale of Baxsto's mineral interests

---

[1]Before the trial court signed its summary judgment order, Baxsto nonsuited without prejudice the claims it had asserted against Roxo Energy, LLC, except for its claim for breach of the most favored nation clause. Baxsto has not raised any issues on appeal that relate to its claim for breach of the most favored nation clause. However, for ease of reference in this appeal, we will refer to Roxo Energy Company, LLC and Roxo Energy, LLC, collectively, as Roxo.

in Howard and Borden Counties. During a meeting between the parties sometime that month, Fitzgerald made the following representations: (1) a lease would give Roxo leverage over other mineral owners in the area; therefore, if Baxsto would execute a lease quickly, Roxo would give Baxsto the most favorable deal of any owner; (2) Roxo was not in the business of "flipping mineral interests," but instead intended to drill on and develop the acreage; and (3) Roxo planned to make its money "at the bit." Baxsto and Roxo signed a letter of intent on October 26, 2016; the letter provided that these parties would execute an oil and gas lease within sixty days and that they had agreed upon a lease bonus price of $5,000 per net mineral acre.

The parties executed the lease, an oil and gas lease memorandum, and a lease purchase agreement in early November 2016. The lease purchase agreement included (1) a provision that Roxo could record the lease after Roxo had tendered the lease bonus payment to Baxsto and (2) an option period for Roxo to purchase the lease. However, if Roxo elected not to exercise its option to purchase the lease, the executed lease would then be returned to Baxsto. Roxo recorded the oil and gas lease memorandum in Howard and Borden Counties on November 17, 2016, before the deadline to exercise the lease purchase option expired and before it made any lease bonus payment to Baxsto. Vortus was informed that the memorandum had been recorded; Baxsto was not.

After the execution of the lease purchase agreement, Fitzgerald arranged a meeting with representatives from Roxo, Baxsto, and Vortus. During this meeting, Brian Crumley, a co-founder and agent of Vortus, represented to Cole that Vortus only invested in companies that drilled acreage. Fitzgerald and Crumley also stated that Roxo and Vortus were not in the business of leasing and flipping minerals to other operators.

As the deadline to exercise the lease purchase option approached, Roxo requested an extension of the option period to complete the necessary title due diligence. At that time, Vortus prepared a letter explaining that it was managing assets of approximately $450 million and that it was considering the formation of a partnership with Roxo to purchase ownership interests in the Permian Basin. Fitzgerald sent this letter to Cole with the hope that it would increase Baxsto's confidence in Roxo's request for an extension of the option period. Fitzgerald also represented that Vortus had committed to investing $200–250 million to develop Baxsto's acreage.

By the end of December 2016, the parties had agreed to extend Roxo's option period to purchase the lease under an extension to the lease purchase agreement. As a part of the extension, Roxo agreed to include a "most-favored nations clause." This clause provided that within six months of the date on which the lease was executed, if Roxo paid a larger lease bonus per net mineral acre to any other lessor who owned an undivided interest in the area covered by the lease, Roxo would then be obligated to pay Baxsto the greater lease bonus amount.

As the deadline for this extension approached, Roxo requested a second extension of the option period. Representatives from Roxo, Baxsto, and Vortus met in Austin to discuss Roxo's request. At this meeting, Fitzgerald and Crumley assured Baxsto that Roxo had the necessary funds to close the deal and that it needed the second extension, like it did the first one, so that it could complete title due diligence. Fitzgerald and Crumley also stated that Roxo would be Vortus's "crown jewel." Fitzgerald disclosed that Roxo was also negotiating with Navigator Oil & Gas (Navigator), a mineral interest owner in the same acreage as Baxsto. Fitzgerald stated that although Navigator had proposed an $11,000 lease bonus amount per net mineral acre, Navigator would not be paid that amount. Fitzgerald and Crumley

4

represented that Navigator would receive a lease bonus less than $11,000 and that Roxo would force Navigator to participate before it paid them a lease bonus in excess of $5,000.

At the end of January 2017, the parties executed a second extension to the lease purchase agreement for the Howard County acreage. Because additional time was needed to complete title due diligence related to the Borden County acreage, the parties executed a second lease purchase agreement on February 15, 2017. This second agreement pertained only to the Borden County acreage and extended the time to complete all necessary due diligence to April 28, 2017. Later, on February 24, 2017, Roxo made the lease bonus payment to Baxsto for the Howard County acreage.

Shortly after Roxo made the lease bonus payment to Baxsto, Fitzgerald advised Cole that Vortus had decided to reduce its capital commitment to develop Baxsto's acreage from $200–250 million to $70–75 million. Despite this, Fitzgerald also told Cole that Roxo was still interested in purchasing Baxsto's mineral interests and he proposed a meeting to discuss the terms of a potential sale. Cole later attended a meeting in Fort Worth with representatives from Baxsto, Roxo, and Vortus. At this meeting, Fitzgerald explained that it had reduced its lease bonus offer to Navigator from $4,000 to $3,500. Cole was told that because Roxo had offered and intended to pay Navigator a lower lease bonus price, Roxo and Vortus now placed a higher value and sales price for Baxsto's acreage than it otherwise would in the future. Based on these developments and representations, Cole believed that Baxsto could sell its mineral interests for two to three times the lease bonus amount per net mineral acre that was currently being paid for the area.

After this meeting, Baxsto began negotiating with Roxo for the sale of Baxsto's mineral interests. At the beginning of April 2017, the parties executed an

5

option for Roxo to purchase Baxsto's mineral interests in Borden and Howard Counties no later than May 26, 2017, in exchange for a price of $15,126 per net mineral acre. In late April, Baxsto agreed to extend the option to purchase the lease for the Borden County acreage to May 26, 2017.

During the option period, Roxo requested a reduction in the purchase price by $353,508 because of defects in Baxsto's chain of title. The parties agreed to meet in Fort Worth to discuss this request. At this meeting, Fitzgerald expressed his belief that this offer was a "great deal" for Baxsto because Baxsto had received the highest lease bonus amount ($5,000) and Navigator was currently being offered a lower lease bonus amount, which indicated a lower valuation of the mineral interests going forward.

On May 26, 2017, the parties closed on the sale of Baxsto's mineral interests, and Roxo transferred $5,666,602.50 to Baxsto.[2] After the sale was consummated, Cole learned of certain actions taken and representations made by Roxo and Vortus that he believed conflicted with the representations they had made to Baxsto during the parties' negotiations. As a result, Baxsto would later contend that the representations were false and made with the intent to induce Baxsto to "lock itself" into a lease and then later sell its mineral interests to Appellees at a price lower than true market value.

Because of these alleged misrepresentations, Baxsto originally filed two lawsuits that the trial court later consolidated. Although both lawsuits concerned the same events and similar claims, the lawsuits did not have a complete commonality of parties. In its original petitions, Baxsto asserted several direct and derivative fraud

---

[2]Two amounts reduced the sales price: (a) a $2,268,937.50 lease bonus payment; and (b) a $353,508 offset, which is the amount that the parties agreed to after they executed the option contract.

claims against the consolidated defendants (Appellees on appeal). Baxsto's direct fraud claims are:

- Common-law fraud against Roxo and Vortus;
- Fraudulent inducement against Roxo and Vortus;
- Statutory fraud against Roxo and Vortus; and
- Fraud by non-disclosure against Roxo and Vortus.

Baxsto's derivative fraud claims are:

- Beneficiaries of fraud and statutory fraud against Roxo, REC, and Roxo FW;
- Civil conspiracy against Vortus, REC, and Roxo FW;
- Constructive trust against Vortus, REC, and Roxo FW; and
- Joint enterprise against Vortus and Roxo FW.

Appellees later filed combined traditional and no-evidence motions for summary judgment as to all causes of action asserted by Baxsto, which the trial court granted. This appeal followed.

## II. *Evidentiary Challenges Raised by Appellees*

Before we consider Baxsto's summary judgment evidence, we must address Appellees' challenge and objections to Cole's affidavit, which the trial court overruled. On appeal, Appellees re-urge the argument that they made in the trial court that Cole's affidavit is a "sham" because it contains conclusory and contradictory statements and, thus, cannot constitute competent summary judgment evidence.

### A. *Standard of Review – Evidentiary Rulings*

Although we review a trial court's grant of summary judgment de novo, a trial court's decision to admit or exclude summary judgment evidence is reviewed for an abuse of discretion. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017)). This standard

7

applies when, as in this case, the "sham affidavit" doctrine is raised. *Lujan*, 555 S.W.3d at 84–85. An abuse of discretion exists only when the trial court's decision is made without reference to any guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). We must uphold the trial court's evidentiary rulings if there is a legitimate basis for its rulings. *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

B. *Sham Affidavit Doctrine*

Generally, deposition testimony does not trump or control over an affidavit in determining whether a motion for summary judgment should be granted. *Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (Tex. 1988). Thus, when conflicting inferences may be drawn from deposition testimony and an affidavit that is later executed by the same person and filed in a summary judgment proceeding, a fact issue is presented that will preclude summary judgment. *Id.*; *Pando v. Sw. Convenience Stores, L.L.C.*, 242 S.W.3d 76, 79 (Tex. App.—Eastland 2007, no pet.). However, when (1) a person executes an affidavit after he is deposed and (2) there is a clear contradiction between his deposition testimony and statements in his subsequent affidavit on (3) a material point (4) without explanation, the "sham affidavit" doctrine may apply. If so, the contradictory statements in the affidavit may be disregarded. *Lujan*, 555 S.W.3d at 88; *Pando*, 242 S.W.3d at 79 (citing *Del Mar College Dist. v. Vela*, 218 S.W.3d 856, 862 n.6 (Tex. App.—Corpus Christi–Edinburg 2007, no pet.)).

The statements in Cole's affidavit are the primary source of Baxsto's summary judgment evidence regarding the representations that it contends Appellees made during the parties' negotiations. Thus, if it is determined to be a sham, Cole's affidavit, or possibly certain excerpts, should be disregarded because

8

"such an affidavit merely creates a sham issue and cannot be used to avoid summary judgment." *Pando*, 242 S.W.3d at 79.

The deposition testimony that Appellees contend is contradictory was given by Cole in July 2017 in a case that involves others who are not parties to this appeal. During his deposition, Cole discussed the transactions that occurred between Roxo and Baxsto. Cole testified that he proposed the $5,000 lease bonus amount to Roxo, which he thought was "outrageous" at the time; however, Roxo accepted it. Cole stated that was how he "knew they were real" and why he agreed to meet with Roxo to discuss the potential leasing of Baxsto's mineral interests. Cole also explained that there were outstanding nonparticipating royalty interests (NPRIs) that burdened Baxsto's royalty interests in the acreage. Because of these NPRIs, Cole opined that "it doesn't make a lot of sense necessarily to own this acreage" and "it made more sense to us to let them own it from that perspective."

In his affidavit, Cole noted that the sale of Baxsto's mineral interests occurred at the end of May 2017 and that he did not become aware that all of Fitzgerald's representations were false until "a few months later." Contrary to Appellees' assertion, Cole, in his affidavit, does not directly contradict any of the statements that he made during his July 2017 deposition. Appellees argue that Cole's affidavit should not be considered because the representations made by Fitzgerald, of which Baxsto now complains, are not mentioned in Cole's first deposition. However, as asserted by Baxsto, when Cole was deposed in July 2017, he had not yet discovered that Fitzgerald's representations were false, as Baxsto now believes. Further, the source of Cole's alleged contradictory statements is a deposition that was taken in a different lawsuit—where the focus of his testimony pertained to the parties' disputes that were raised in that lawsuit. When Cole was deposed in the case before us, he

9

directly commented on, but did not contradict, the statements that he made in his affidavit.

When we consider Cole's deposition testimony and his affidavit in the light most favorable to Baxsto, we cannot say that a clear contradiction on a material point exists. Therefore, the sham affidavit doctrine does not apply to or preclude Cole's affidavit, and the trial court did not abuse its discretion when it overruled Appellees' objections on this basis. As we move on to consider Baxsto's issues on appeal, we include this evidence in our review.

III. *Standard of Review – Summary Judgment*

We review a trial court's grant of summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). When the trial court does not specify the grounds for its ruling, as is the circumstance here, a summary judgment must be affirmed if any of the grounds on which summary judgment was sought are meritorious. *Id.*

To defeat a no-evidence motion, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see* TEX. R. CIV. P. 166a(i). A no-evidence challenge will be sustained when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merriman*, 407 S.W.3d at 248 (quoting *King Ranch*, 118 S.W.3d at 751).

A party moving for a traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to

judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). For a trial court to grant a defendant's traditional motion, the defendant must conclusively negate at least one essential element of the cause of action being asserted by the plaintiff or conclusively establish each element of a defense or affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). "Evidence is conclusive only if reasonable people could not differ in their conclusions. . . ." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston*, 589 S.W.2d at 678–79.

In reviewing either a traditional or a no-evidence summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail*, 593 S.W.3d at 181; *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We credit evidence favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007).

Ordinarily, when a party moves for summary judgment on both no-evidence and traditional grounds, we address the no-evidence grounds first. *See Merriman*, 407 S.W.3d at 248 ("if the non-movant fails to produce legally sufficient evidence to meet [its] burden as to the no-evidence motion, there is no need to analyze whether the movant[s] satisfied [their] burden under the traditional motion"); *Ford Motor*

11

*Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). The reason for this is to avoid redundancy.

IV. *Claims Raised by Baxsto*

The parties' disputes focus primarily on what representations were allegedly made by Appellees to Baxsto about the following: (1) the lease bonus amounts—which according to Baxsto would significantly affect the value of its mineral interests for purposes of selling the interests to Appellees—that Appellees would pay to Baxsto and all other mineral owners in the area; (2) the capital improvements that Appellees intended to commit to develop the acreage and the interests that they acquired from Baxsto; (3) whether Appellees intended to "flip" the interests they acquired from Baxsto rather than drilling on the acreage and developing the acquired interests; and (4) whether Appellees promised not to record the lease that the parties had executed until after Appellees had paid the negotiated lease bonus to Baxsto.

In its pleadings in the trial court, Baxsto alleged several direct fraud causes of action against Appellees, namely, common-law fraud, fraudulent inducement, fraud by nondisclosure, and statutory fraud under Section 27.01 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a)(1) (West 2023).

Common-law fraud requires (1) a material misrepresentation; (2) which was false; (3) which was either known to be false when made or was asserted without knowledge of its truth; (4) which was intended to be acted upon by the other party; (5) which the other party relied upon; and (6) which caused injury to the other party. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)); *Nelson v. McCall Motors, Inc.*, 630 S.W.3d 141, 147 (Tex. App.—Eastland 2020, no pet.).

Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance with no intention of performing at the time it was made. *Zorrilla*, 469 S.W.3d at 153.

Fraud by nondisclosure occurs when a party owes a duty to disclose information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). This type of fraud is shown when (1) the defendant deliberately concealed or failed to disclose material facts known to it; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the defendant knew that the plaintiff was ignorant of the undisclosed facts and did not have an equal opportunity to discover them; (4) the defendant intended to induce the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, which resulted in injury. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019).

The proof that is required to establish statutory fraud is similar to that which is necessary to prove a claim for common-law fraud; the difference is that this type of fraud is unique to real estate transactions. To recover under this theory, the claimant must establish that (1) a transaction involving real estate or stock was involved; (2) the defendant made a false representation of a past or existing material fact or made a promise to perform an act with the intention of not fulfilling it; (3) the false representation or promise was made by the defendant for the purpose of inducing the plaintiff to enter into a contract; and (4) the plaintiff entered into the contract in reliance on the false representation or promise. *Nelson*, 630 S.W.3d at 147 (citing Bus. & Com. § 27.01(a)); *see also Collective Asset Partners LLC v. Schaumburg*, 432 S.W.3d 435, 443 (Tex. App.—Dallas 2014, pet. denied).

13

## V. *Analysis*

In six issues, Baxsto contends that the trial court erred when it granted Appellees' motions for summary judgment because: (1) more than a scintilla of evidence exists as to Appellees' no-evidence challenges to the elements of Baxsto's fraud claims; (2) Appellees failed to (a) establish that all fraudulent representations were "directly contradicted" by the pertinent language in the parties' contracts and (b) conclusively negate the element of justifiable reliance; (3) Baxsto has standing to assert its fraud claims; (4) Baxsto's fraud claims are not barred by the economic loss rule; (5) Baxsto's fraud claims are not barred by the statute of frauds; and (6) Baxsto's summary judgment evidence raises fact issues as to Appellees' no-evidence challenges to certain elements of Baxsto's derivative fraud claims.

### A. *No-Evidence Summary Judgment*

In their no-evidence grounds, Appellees contended that there was no evidence of "the knowledge of falsity, intent to induce, and duty to disclose elements" of Baxsto's fraud claims. The first argument advanced by Baxsto is that the trial court erred if it granted Appellees' motions for summary judgment based on no-evidence grounds, because Baxsto's summary judgment evidence raised genuine issues of material fact as to each of the three fraud elements that Appellees challenged—(1) knowledge of falsity, (2) intent to induce, and (3) duty to disclose. Knowledge of falsity and intent to induce are required elements for each of Baxsto's fraud claims. The duty to disclose is only pertinent to Baxsto's fraud by nondisclosure claim. We review the summary judgment evidence for each element in turn.

### 1. *Knowledge of Falsity*

A statement is not fraudulent unless the speaker either knew it was false when made or made it recklessly without knowledge of its truth. *Johnson & Higgins of*

14

*Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998); *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995). Proof that a defendant made a statement with knowledge of its falsity or recklessly without knowledge of its truth may be proved by direct or circumstantial evidence. *Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 526; *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

Generally, knowledge is a question for the factfinder's determination. Therefore, because intent to defraud can be established by circumstantial evidence alone, Baxsto contends that a jury should determine whether Appellees *knew* that the representations they made to Baxsto were false. *See Spoljaric*, 708 S.W.2d at 435. Baxsto argues that there is conflicting summary judgment evidence, albeit at least some or a scintilla of evidence, that defeats Appellees' no-evidence challenge to the "knowledge" element of Baxsto's fraud claims, and which shows that Appellees induced Baxsto to lease and later sell its mineral interests to Appellees at a lower, reduced price.

Baxsto asserts that four categories of representations are central to and indicative of Appellees' larger fraudulent plan to deceive Baxsto into ultimately selling its mineral interests at a "reduced" price. These representations include (1) the true value of the bonus payments to be paid to Navigator, (2) Roxo's intent to drill and develop the interests it acquired from Baxsto under the lease, (3) Vortus's capital improvement funding commitment, and (4) a promise by Roxo that the lease would not be recorded until *after* the lease bonus was paid to Baxsto. Baxsto argues that Appellees have not denied that the representations they made to Baxsto were false. Nevertheless, Appellees contend that there is no evidence that they *knew* the representations were false or that the representations were false when they were made.

15

First, the record shows that Fitzgerald, as a representative of Roxo, and Crumley, as a representative of Vortus, repeatedly represented to Baxsto that Roxo would never pay, nor would Vortus permit them to pay, a lease bonus of more than $5,000 to any other mineral owner in the area and, specifically, that they would not pay Navigator a lease bonus of more than $5,000. These representations were made to Baxsto throughout the parties' ongoing negotiations, which ultimately resulted in the parties executing the original lease agreement and subsequent sales contract.

According to the summary judgment evidence, Fitzgerald made the last of these representations to Baxsto *after* Roxo had already agreed to pay Navigator a lease bonus that was twice the amount that Roxo had promised to Baxsto. Roxo and Baxsto met in May 2017. In his affidavit, Cole states that during this meeting Fitzgerald represented that Roxo would never agree to pay Navigator a lease bonus that exceeded $5,000. However, by no later than May 10, 2017, Roxo had offered Navigator a lease bonus payment of $8,000 per net mineral acre. Vortus also was aware that this offer had been made to Navigator. Just over a week later, on May 18, 2017, Roxo and Navigator agreed that Roxo would pay Navigator a lease bonus of $10,000 per net mineral acre.

Appellees argue that (1) the parties' negotiations had been finalized as of April 7, 2017, when the option to purchase the lease agreement was signed and (2) there is no evidence Roxo *knew* that false representations were made to Baxsto while the parties' negotiations were active. However, the record shows that Roxo initiated a counteroffer at some point after April 7, 2017, and that the parties later agreed to a lower purchase price based on this counteroffer. Thus, the parties' negotiations were revived by Roxo and continued after April 7, 2017. Further, the sale of Baxsto's mineral interests did not close until May 25, 2017, when Roxo paid the reduced purchase price.

Construing the summary judgment evidence in the light most favorable to Baxsto, we conclude that there is at least a scintilla of evidence that Appellees *knew* that their representations regarding the lease bonus amounts were false at the time they were made.

Second, Fitzgerald and Crumley made various representations and assurances regarding Appellees' intention to drill on and develop the mineral interests that they acquired from Baxsto, including that: (1) Roxo intended to generate income by drilling on Baxsto's acreage, not by flipping the lease; (2) Roxo and Vortus were not in the business of leasing and flipping mineral interests to other operators; (3) Vortus only invested in companies that drilled; and (4) Roxo and Vortus would begin drilling operations by the end of the third, potentially fourth, quarter of 2017.

The summary judgment evidence shows that (1) Roxo never drilled a well on Baxsto's acreage or any other land as an operator; and (2) Roxo sold the leasehold interests it acquired from Baxsto to a third party in 2018. Baxsto also identified a Roxo drilling schedule that Baxsto contends establishes that Roxo did not plan to drill more than the minimum number of wells that were necessary to hold the lease and that its first drilling operation was planned for 2019. However, this drilling schedule is not relevant to understanding Roxo's knowledge of falsity at the time the representations were made to Baxsto. This drilling schedule does not include any reference to the leasehold interest associated with Baxsto's mineral interests. Nor is there any indication as to when this schedule was created. It only displays Roxo's drilling schedule for 2019 but is silent as to any drilling schedule for 2017 and 2018. As such, this drilling schedule sheds no light on Roxo's knowledge of falsity at the time the representations were made by Appellees.

Further, that Roxo never drilled on and subsequently sold the leasehold, while circumstantial and having occurred after the representations were made, is some

17

evidence that Roxo *knew* its statements were false at the time the representations were made. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) ("[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made. (alterations in original) (quoting *Spoljaric*, 708 S.W.2d at 434)).

Construing the summary judgment evidence in the light most favorable to Baxsto, we conclude that there is at least a scintilla of evidence as to whether Roxo *knew* that Appellees' representations regarding Roxo's intent to drill and not flip the mineral interests acquired from Baxsto were false at the time they were made.

Third, Fitzgerald and Crumley represented to Cole that Vortus had committed $200–250 million to develop Baxsto's acreage with Roxo. Baxsto argues that Fitzgerald and Crumley knew this representation was false at the time it was made because, according, in part, to documents that the parties submitted in camera and agreed are confidential and subject to a protective order, (1) Crumley testified that the amount of Vortus's capital commitment was memorialized in Roxo's LLC agreement and had not been altered, (2) Fitzgerald testified that Vortus's capital commitment was included in the LLC agreement, and (3) the LLC agreement shows that the funding commitment amount was not $200–250 million as represented. Further, Appellees, within days of exercising the option to lease Baxsto's land, represented that the capital commitment to develop the acreage had been reduced.

Appellees have neither briefed nor responded to this argument. We have reviewed the summary judgment evidence in the light most favorable to Baxsto and conclude that there is at least a scintilla of evidence that Roxo and Vortus *knew* their representation that Vortus had committed a capital improvement amount of $200–250 million to develop the interests acquired from Baxsto was false when made.

18

Finally, Fitzgerald promised Baxsto that Roxo would not record the lease or lease memorandum until *after* the lease bonus was paid to Baxsto. The lease purchase agreement also included a recording provision that allowed a recording of the lease or lease memorandum only *after* Roxo had exercised the option to purchase the lease when it paid the agreed-upon lease bonus. The summary judgment evidence shows that (1) Fitzgerald signed the lease purchase agreement, (2) Fitzgerald made a request for the lease to be recorded on November 11, 2016, (3) the lease was recorded on November 17, 2016, and (4) the lease bonus was not paid to Baxsto until February 24, 2017. As such, Baxsto argues that the timing of the recording, so soon after the lease was signed and provided to Roxo, is, at a minimum, circumstantial evidence of the falsity of this representation.

Again, Appellees neither briefed nor responded to this argument. Viewing the summary judgment evidence in the light most favorable to Baxsto, we conclude that the immediacy and timing with which Roxo recorded the lease memorandum after it had executed the lease purchase agreement is at least a scintilla of evidence that Roxo *knew* its representation regarding when the lease or lease memorandum would be recorded was false when made.

We have reviewed the summary judgment evidence that pertains to the knowledge-of-falsity element of Baxsto's fraud claims. When we construe the summary judgment evidence in the light most favorable to Baxsto, as we must, we conclude that at least a scintilla of evidence that raises a genuine issue of material fact exists regarding Roxo's and Vortus's knowledge of the falsity of their representations at the time they were made.

### 2. *Intent to Induce*

When we consider the intent element of a fraud claim, we focus on the defendant's knowledge and intent to induce reliance. *Ernst & Young, L.L.P. v. Pac.*

*Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). A defendant who acts with knowledge that a particular result will follow is considered to have intended for such a result to occur. *Id.* at 579. Thus, fraud's intent element requires a degree of certainty that goes beyond mere foreseeability. *Id.* at 579–80. The intent to defraud is usually not susceptible to direct proof and, as such, most often must be proven by circumstantial evidence. *Aquaplex, Inc.*, 297 S.W.3d at 774–75; *Spoljaric*, 708 S.W.2d at 435. Moreover, "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric*, 708 S.W.2d at 434; *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 15 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Appellees' knowledge of the falsity of their representations is, without more, some evidence of their intent to induce Baxsto. Further, the timing of Appellees' representations—during meetings where Baxsto had expressed reservations about agreeing to the lease option, extending the lease option, and the terms of the sale of its mineral interests to Appellees, of which Appellees were attempting to persuade Baxsto to agree—is, at a minimum, circumstantial evidence of Appellees' intent to induce Baxsto's reliance on Appellees' representations.

Baxsto further argues that the representations made by Appellees were part of a larger plan to induce Baxsto to ultimately sell its mineral interests to Appellees at a reduced price. The record shows that Appellees always had an interest in purchasing Baxsto's mineral interests, but Appellees believed that this was a "long shot" and would require convincing Baxsto that it should sell. Appellees' strategy was to gain operational control in the area through the acquisition of other mineral interests, and the acquisition of Baxsto's mineral interests was an integral part of this

20

strategy. This evidence is consistent with Appellees' intent to induce Baxsto to sell its mineral interests at a reduced price.

As for the reduced price by which Baxsto argues that it was persuaded to sell its mineral interests, Baxsto asserts that Appellees engaged in a two-step scheme: (1) "lock" Baxsto into a lease with false promises of nonexistent funding and an aggressive drilling plan that would generate royalties, and (2) then immediately after locking Baxsto into the lease, make representations regarding a reduction of available capital improvement funding that Vortus had committed to develop the lease and a lower bonus price being offered to Navigator in order to induce Baxsto to sell its mineral interests at a lower price.

In support of this, the summary judgment evidence shows that Appellees represented that Vortus intended to contribute $200–250 million to support drilling operations under the lease with Baxsto. According to Baxsto, Appellees knew that Vortus never intended to commit such an amount. Soon after Baxsto agreed to the lease terms, Appellees then represented that Vortus had "reduced" its funding commitment to $70–75 million. Appellees had also consistently represented to Baxsto that the lease bonus price being offered to Navigator was less than $5,000. But at some point before the sale of Baxsto's mineral interests was finalized, Appellees offered Navigator a lease bonus price higher than $5,000 and ultimately agreed to pay Navigator a lease bonus price of $10,000.

All the while, Appellees knew that Baxsto was using a metric to assess a value to its mineral interests—based on a multiplier of 3.2 times the lease bonus price that Baxsto understood was being paid to others in the area—and then formulating a sales price based on this metric. Baxsto sought to obtain the highest lease bonus that could be paid because the lease bonus amount would affect the sales price of its mineral interests. Baxsto contends that, but for Appellees' representations, it would have

21

adjusted its metric and, accordingly, the sales price of its mineral interests. Instead, and in reliance on Appellees representations, Baxsto sold its mineral interests to Roxo for less than half the price of what it would have sold them for had it not been deceived. This is, at a minimum, a scintilla of evidence in support of Baxsto's claim of Appellees' two-step scheme to induce Baxsto into selling its mineral interests at a reduced, lower price.

We have reviewed the summary judgment evidence that addresses the intent-to-induce element of Baxsto's fraud claims. When we construe the evidence in the light most favorable to Baxsto, we conclude that at least a scintilla of evidence that raises a genuine issue of material fact exists regarding Appellees' intent to induce Baxsto's reliance on the representations made by Appellees.

### 3. *Duty to Disclose*

The duty to disclose is an element of Baxsto's fraud-by-nondisclosure claim. A duty to disclose may arise in four circumstances: (1) when there is a confidential or fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression in doing so. *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). Baxsto argues there is ample summary judgment evidence that demonstrates circumstances that created a duty on behalf of Appellees to disclose the whole truth, to disclose new information, or to correct a false impression.

For instance, as to the alleged representations made by Appellees concerning the Navigator lease bonus amount, Baxsto asserts that Appellees had a duty to correct Fitzgerald's representation that Appellees would never pay Navigator a lease

22

bonus of more than $5,000 per net mineral acre. Appellees contend that they did not have a duty to correct this representation here because Baxsto had already obligated to sell its mineral interests when Appellees agreed to pay Navigator a lease bonus amount greater than $5,000. However, as discussed above, Appellees revived the parties' negotiations and engaged in further discussions with Baxsto after or near the time that they had agreed with Navigator to pay it a much higher lease bonus amount. This circumstance gave rise to a duty for Appellees to disclose the new information—that Appellees were negotiating a higher lease bonus price with others or that Appellees had already agreed to a higher lease bonus price—to correct their previous lease bonus amount representation that was untrue.

Regarding the representations of Vortus's capital improvement commitment to develop the lease, Baxsto argues that Appellees had a duty to correct and clarify that Vortus had never intended to commit more than $70–75 million to the Roxo project. Instead, only after Baxsto was "locked" into the lease did Appellees advise Baxsto that Vortus had "reduced" its capital funding commitment to $70–75 million. Baxsto also contends that this statement, regarding Vortus's reduction in capital funding, failed to disclose the whole truth about Vortus's involvement in Roxo's project because Roxo could request additional capital funding above $75 million, if needed. This summary judgment evidence demonstrates that Appellees only made a partial disclosure that conveyed a false impression concerning the reduction of Vortus's capital funding commitment and that no option existed to request additional capital funding from Vortus.

Finally, as to the representation that Roxo would not record the lease and lease memorandum until *after* Baxsto had received the lease bonus payment, Baxsto argues that when Roxo recorded the lease memorandum prior to paying the lease bonus, this gave rise to a duty to disclose that its previous statement about the

23

"timing" of recording the lease memorandum was untrue. Baxsto claims that if Roxo had disclosed this circumstance, it would not have agreed to extend the lease option. Conversely, Appellees contend that their recording of the lease memorandum was only, if anything, a breach of the parties' contract and that they did not have a duty to self-report an alleged breach of contract. However, this circumstance cannot be characterized as only a simple breach of contract.

The summary judgment record shows that Roxo requested two extensions to execute the lease purchase agreement *after* it had already recorded the lease memorandum. Here, the circumstances do not support the conclusion that Roxo did not have the intent to perform its promise to record the lease or lease memorandum in the manner as represented when it requested, and was granted, two extensions because it had already, in fact, recorded the lease memorandum. As such, we find this circumstance to be more akin to situations where a party induced another into signing a contract with a promise that was never intended to be kept as opposed to situations in which a party intended to perform but then later changed his mind. *See Susanoil, Inc. v. Cont'l Oil Co.*, 519 S.W.2d 230, 236 (Tex. App.—San Antonio 1975, writ ref'd n.r.e.) ("The gist of the fraud in cases involving promises made with no intention to perform is not breach of the promise, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact non-existent, and the deception of the promisee by such false promise.").

We have reviewed the summary judgment evidence that pertains to the duty-to-disclose element of Baxsto's fraud-by-nondisclosure claim. When we construe the evidence in the light most favorable to Baxsto, we conclude that at least a scintilla of evidence that raises a genuine issue of material fact exists regarding whether the

24

circumstances surrounding the parties' negotiations gave rise to a duty on behalf of Appellees to disclose.

On this record, we have considered the summary judgment evidence and we hold that at least a scintilla of evidence that raises a genuine issue of material fact exists for each element of Baxsto's fraud claims that Appellees identified in their no-evidence challenges. As such, the trial court erred when it granted Appellees' summary judgment motions, to the extent that the trial court's grounds were based on Appellees' no-evidence challenges. Accordingly, we sustain Baxsto's first issue on appeal.

B. *Traditional Summary Judgment*

1. *Justifiable Reliance*

In its second issue, Baxsto contends that Appellees did not conclusively negate the justifiable reliance element for each of Baxsto's fraud claims because Appellees failed to show that the misrepresentations and omissions were "directly contradicted" by the terms of the parties' contracts. Conversely, Appellees assert that the written agreements that Baxsto signed negate the justifiable reliance element as a matter of law.

Justifiable reliance is an element of each of Baxsto's fraud claims. To prove justifiable reliance, the plaintiff must show that: (1) it actually relied on the defendant's representation; and (2) such reliance was justifiable. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Justifiable reliance usually presents a question of fact. *Orca Assets*, 546 S.W.3d at 654. But this element can be negated as a matter of law when circumstances exist under which reliance cannot be justified. *Id.*

25

"In determining whether justifiable reliance is negated as a matter of law, courts 'must consider the nature of the [parties'] relationship and the contract.'" *Id.* (alteration in original) (quoting *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.)). "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. . . . [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Id.* (alterations in original) (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) (per curiam)). As such, in a complex, "arm's-length" transaction, a party to the transaction should investigate representations that may be false. *Id.* When a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *Id.* To this end, that party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." *Id.* (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.)).

a. *Direct Contradiction*

"[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Orca Assets*, 546 S.W.3d at 658; *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019). "[T]here is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the earlier representation." *Orca Assets*, 546 S.W.3d at 659.

"Courts have found direct contradiction even when the terminology appearing in the representation and the writing are not exactly the same." *Id.*

To negate the justifiable reliance element, Appellees must show that the parties' contract, and its terms, "directly contradicts" every representation upon which Baxsto's fraud claims are based. *See id.* Thus, the "direct contradiction" rule only negates the justifiable reliance element when an express promise directly contradicts the representation. However, for purposes of this rule, the contract and the oral representation need not explicitly speak the same subject matter or precisely the same terms. *Orca Assets*, 546 S.W.3d at 659. Here, Appellees argue just that— that Baxsto could not, as a matter of law, have justifiably relied on Roxo's and Vortus's representations because the oral statements made by them (the drilling commitments, the lease bonus amounts to be paid, the capital improvement obligations, and the promise to pay the lease bonus to Baxsto before recording the lease) are directly contradicted by the specific terms of the parties' lease and other written agreements. We consider the oral representations and the corresponding contractual terms, as identified by Appellees, below.

First, the oral representations that Appellees contend support their intent to perform under the oil and gas lease include:

- Roxo would drill and develop Baxsto's land.
- Roxo planned to make its money "at the bit."
- Roxo and Vortus were not in the business of leasing and flipping minerals to other operators.
- Vortus only invested in companies that drilled acreage.
- Vortus had committed $200–250 million specifically to Roxo's project and Roxo would drill until those funds were exhausted.
- Roxo would begin drilling operations by the end of the third— potentially fourth—quarter of 2017.

Before we address the specific contractual provisions that are pertinent to the "direct contradiction" argument, we note that Appellees assert that the terms of the lease did not require that Roxo drill any wells on the lease it had acquired from Baxsto because an oil and gas lease grants a right, not an obligation, to drill wells. As such, Appellees argue that Roxo could elect not to drill any wells. Therefore, any reliance by Baxsto based on Appellees' representations of their intent to drill was unjustifiable. However, a typical oil and gas lease is not merely an option contract, but rather is a conveyance of title to the minerals. *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003) ("In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee . . . [and] the lessee/grantee acquires ownership of all the minerals in place . . . subject to the possibility of reverter in the lessor/grantor."); *Richmond v. Wells*, 395 S.W.3d 262, 266 (Tex. App.—Eastland 2012, no pet.). Further, the purpose of the lease, as identified by the lease itself, is "exploring for, developing, producing and marketing oil and gas." We are not persuaded by Appellees' argument regarding their obligations under the lease.

Importantly, the claims that Baxsto is pursuing in this case are based on fraud, not breach of contract. Thus, the issue before us does not require that we interpret the lease and determine whether any development requirements exist and to what extent those provisions are now enforceable. *See Pool*, 124 S.W.3d at 192. Instead, the issue we must determine is whether Baxsto could have plausibly believed and relied on Appellees' representations regarding capital improvement funding for and the intent to drill on the acreage, in light of the nature and purpose of the lease. *See Orca Assets*, 546 S.W.3d at 654. Given the parties mutual interest in developing the acreage under the lease, it is plausible that Baxsto could have believed Appellees' representations.

28

Appellees further argue that the representations regarding capital improvement funding and the intent to drill are directly contradicted by the lease term and the Pugh clause in the lease. The lease term provides:

> This lease, which is a 'paid-up' lease requiring no rentals, shall be in force for a primary term of three (3) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof.

The Pugh clause contains in relevant part:

> At the expiration of the primary term, or upon the cessation of "continuous drilling operations" (as hereinafter defined), whichever is later, this lease shall terminate as to all lands covered herein not then included in or otherwise allocated to a "production unit" (as hereinafter defined) assigned to each well then producing on the leased premises or lands pooled therewith. For purposes of this Paragraph, Lessee shall be considered to be engaged in continuous drilling operations at the end of the primary term if, within 180 days after the expiration of the primary term, Lessee is engaged in the drilling or reworking of any well on the leased premises and does not allow more than 180 days to elapse between the completion or abandonment of one well on such land and the commencement of another well thereon, until the leased premises have been "fully developed" (as hereinafter defined). . . . The term "fully developed", as used herein, shall mean that point in time when all the leased premises is included within a production unit or units.

The lease term and Pugh clause are silent as to any capital improvement funding terms. These contractual provisions are also silent as to any production requirements within the primary term of the lease. Appellees argue that the absence of any capital improvement funding and production terms in the lease constitutes a direct contradiction to any representation made by them regarding such funding and production. However, the mere absence of a term or condition is not tantamount to a direct contradiction. While a direct contradiction is not necessarily the antithesis

of an absent term, the contract must still express an unambiguous term that, when read by a reasonable person, cannot be plausibly reconciled with an earlier representation. Appellees' representations communicated and expressed an expectation regarding capital improvement funding and production efforts during the primary lease term, although the parties' lease is silent in that regard. Terms concerning the circumstances under which the lease term can be extended do not communicate or express an expectation as to the production to be completed during the primary lease term. Thus, Baxsto could have plausibly believed and relied on Appellees' representations regarding capital improvement funding and the intent to drill on the acreage, in light of the provisions in the parties' lease. Based on this record, we cannot conclude that the lease term and Pugh clause constitute direct contradictions.

With regard to Appellees' representation that Roxo was not in the business of leasing and flipping minerals to other operators, Appellees contend that the assignment provision in the lease directly contradicts this representation. The lease contains a provision that allows "[t]he interest of either Lessor or Lessee hereunder [to] be assigned, devised, or otherwise transferred in whole or in part, by area and/or by depth or zone." If this option were exercised, the Lessee would then be "relieved of all obligations thereafter arising with respect to the transferred interest." Baxsto argues that it still could believe and rely on Appellees' representation regarding its intent not to flip the property it acquired from Baxsto because this was an option that Appellees never intended to exercise. On the other hand, Appellees argue that because the option could be exercised at any time, without Baxsto's consent, this directly contradicts their representation that they were not in the business of flipping properties.

30

In making this argument, Appellees rely on *Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496–501 (Tex. 2019).[3] In this case, the supreme court considered whether a mineral interest lessee's reliance on statements made by the lessor that consent would be provided for any future assignment under the parties' oil and gas lease was justifiable. *Id.* at 479. The court held that oral statements that the lessor would work with the lessee on any assignment of the lease, irrespective of consent, were directly contradicted by the assignment provision that the parties specifically negotiated, and which required the lessor's express written consent prior to any assignment. *Id.* at 497–99. The court reasoned that "under the contract [lessor] holds the keys to an assignment; under [lessor's] representations, however, the keys are firmly in [lessee's] hands." *Id.* at 499.

Here, Appellees' oral statements did not shift the power as to who "held the keys" for purposes of assigning the lease. Appellees contend that their oral representations are only a representation that Roxo and Vortus would not flip the lease. However, such a characterization misstates the evidence. The record shows

---

[3]In *Barrow-Shaver*, the parties to the lease specifically negotiated a consent-to-assign provision. 590 S.W.3d at 475–76. During the parties' negotiations, the lessor made representations that it would "work with" the lessee on any future assignment and provide consent. *Id.* at 497. The lessor also insisted on deleting language in the lease that consent "shall not be unreasonably withheld," but retaining the final consent-to-assign provision as requiring "the express written consent of [lessor]." *Id.* at 476. The court likened these oral representations to: "Carrizo will not stand in the way of Barrow-Shaver assigning its rights under the farmout agreement; rather, Barrow-Shaver will be able to assign whenever it desires and to whomever it desires." *Id.* at 499. But the contract provision gave Carrizo the right to prevent any assignment. "In other words, under the contract Carrizo holds the keys to an assignment; under Laufer's representations, however, the keys are firmly in Barrow-Shaver's hands." *Id.* Notably, the court stated: "Carrizo's statements related directly to the consent requirement, essentially eliminating it from the agreement and representing that Barrow-Shaver alone held the power to assign—a direct contradiction to Barrow-Shaver only being able to assign with Carrizo's express approval." *Id.*

The parties' negotiations in *Barrow-Shaver* and the case before us are distinguishable. In *Barrow-Shaver*, the consent-to-assign provision was specifically negotiated between the two parties and the oral representation was made during those negotiations. Here, there is no evidence that the assignment provision was specifically negotiated or that these representations were made in connection with that provision. Further, in *Barrow-Shaver*, the consent-to-assign provision prohibited any assignment without the express written consent of Carrizo. Here, the assignment provision does not require the consent of the other party.

that Appellees represented that (1) "Roxo was not *in the business* of flipping minerals but intended to lease a position and drill it" and (2) "Roxo and Vortus were not *in the business* of leasing and flipping minerals to other operators." These statements are representations regarding the purpose of Roxo's and Vortus's business operations, not a promise or expression of an intent to not exercise the assignment provision. Further, there is no evidence, and neither party contends, that these oral representations were made when the parties negotiated the terms of the assignment provision because the assignment provision was never specifically negotiated. As such, we conclude that the assignment provision in the lease is not a direct contradiction to the oral representations made by Appellees. Baxsto could have reasonably relied on these representations.

Second, Baxsto claims that it relied on Appellees' oral representation that Roxo would never pay, and Vortus would not allow Roxo to pay, more than a $5,000 lease bonus to either Navigator or any other undivided owner of the same acreage. Appellees contend that the oral representations regarding the lease bonus are directly contradicted by the "most favored nation" clause in the extension to the lease purchase agreement. This clause states:

> In the event Roxo exercises the Option, Roxo agrees that, within six months of the date of the Lease, if Roxo pays a larger bonus per net mineral acre to any other lessor owning an undivided interest in the Land covered by the Lease, then Grantor will be entitled to the greater bonus, which Roxo agrees to pay. The additional bonus will be payable within five (5) business days of Roxo's payment to the third party.

The parties agree that this clause expired on April 30, 2017. If anything, this clause is some evidence of Baxsto's reliance on an oral representation that Roxo would not pay another mineral interest owner in the area a lease bonus greater than $5,000

32

because if Roxo did so before April 30, 2017, it would then be required to pay a matching lease bonus to Baxsto.

As to any oral representations that were made after the expiration of the "most favored nation" clause, this clause could not function as a direct contradiction. Appellees have mischaracterized these oral representations as an alleged commitment to extend the "most favored nation" clause for a period longer than six months. However, that is not the oral representation that Baxsto has asserted against Appellees in this case. The representation here is that Roxo assured Baxsto that Roxo would not pay another mineral interest owner in the area a lease bonus that exceeded $5,000. Further, Roxo continued making this representation throughout the duration of the parties' negotiations. The "most favored nation" clause could not contradict the oral representations that were made by Appellees after the clause had expired and during the stages of the parties' negotiations for the sale of Baxsto's mineral interests because that provision is not included in the contract for sale and the lease was not subsumed by the contract for sale. Thus, in determining the sales price of Baxsto's mineral interests, Baxsto could have reasonably relied on Appellees' representations that Roxo would not pay Navigator, or any other mineral interest owner in the area, a lease bonus amount that exceeded $5,000.

Third, Baxsto claims that it relied on Appellees' oral representation that Roxo would not record the lease until *after* it had paid the lease bonus to Baxsto. Appellees did not raise, in the trial court or on appeal, any argument as to Baxsto's justifiable reliance on this oral representation. Further, and as Baxsto points out, the lease purchase agreement provides that Roxo would record the lease only *after* it had tendered or delivered the lease bonus payment to Baxsto.

Notably, the direct contradictions that Appellees argue exist are all contained in the lease and associated memorandum. The harm that Baxsto contends it

sustained is that, in reliance on Appellees' representations, it sold its mineral interests to Appellees for a lower, reduced amount; according to Baxsto, it would not have done so had it known the truth. Here, Appellees have not identified any provision from the contract for sale, the lease, the lease memorandum, or any other written agreement, that directly contradict their oral representations. In fact, the parties' written agreements confirm, rather than contradict, Appellees' oral representations. Thus, Appellees have failed to meet their burden of identifying direct contradictions in the parties' contracts.

### b. *Red Flags*

"[A] person may not justifiably rely on a misrepresentation if there are 'red flags' indicating such reliance is unwarranted." *Orca Assets*, 546 S.W.3d at 655 (quoting *Grant Thornton, LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). "Red flags" typically consist of a series of events that warrant further investigation. *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)). A "red flag" may also be a part of the justifiable reliance analysis. *Nelson*, 630 S.W.3d at 148. In our consideration of any "red flags" that may be present here, we must "view the circumstances in their entirety while accounting for the parties' relative levels of sophistication." *Orca Assets*, 546 S.W.3d at 656.

According to Appellees, all parties to this transaction were represented by sophisticated and knowledgeable oil and gas businessmen and negotiators. Certainly, the parties would benefit from the lease or sale of Baxsto's mineral interests, even though their interests in doing so were adverse—Baxsto sought to sell the subject mineral interests for the highest price, while Appellees sought to pay the lowest price for these interests. Cole, who was the main player for Baxsto during the parties' negotiations, has an extensive history of working in the oil and gas industry. He began negotiating oil and gas leases in 2014 and is familiar with the

different operators in the area and the standard terms of oil and gas leases. Ashley Stout is a former landman and has owned and managed Baxsto since 2013. Similarly, Fitzgerald also has an extensive history of working in the oil and gas industry. He was the CFO of a different oil and gas company prior to being employed by Roxo at the end of 2015. Crumley is a founder of Vortus, a private equity firm that was created to generate long-term capital gains primarily through investments in the mid-market upstream energy industry in North America.

Despite the parties' disagreements, of which there are many, there is no dispute here that the parties to this appeal are all sophisticated and knowledgeable oil and gas business entities and that the parties' contracts were negotiated at arm's length. However, Appellees have failed to identify any circumstances that arose during the parties' negotiations that would constitute a "red flag."

First, Appellees argue that Baxsto's status as a sophisticated party in an arm's-length transaction means that Baxsto could never justifiably rely on oral representations that do not become part of the parties' final agreement. However, the sophistication of the parties, alone, is not a "red flag" that can negate justifiable reliance, but rather is the lens through which we consider the impact of any "red flags" that are present. *See id.* at 656 (noting that sophisticated business entities participating in an arm's-length transaction should be expected to recognize red flags that others who are less experienced may not).

Second, Appellees argue that statements made by a party regarding drilling plans and bonus amounts are "red flags." Because these statements concern future events or plans, Appellees assert that their reliability is inherently unverifiable. However, many of the statements that Baxsto has identified do not concern future events. Further, the statements that do concern future events—such as Roxo's intent to drill and develop the acreage or to generate its revenue "at the bit"—do not

directly contradict the lease. Instead, these statements align with the purpose identified within the lease—"exploring for, developing, producing and marketing oil and gas." Therefore, while circumstances could change in the future and require that Roxo act differently than originally expressed, it cannot be said that Baxsto "relied blindly" on Appellees' representations regarding future events.

We have considered the summary judgment evidence in the light most favorable to Baxsto and we conclude that Appellees did not conclusively negate the element of justifiable reliance. As such, the trial court erred when it granted summary judgment in favor of Appellees, to the extent that the trial court's grounds were based on Appellees' justifiable reliance challenge. Accordingly, we sustain Baxsto's second issue on appeal.

### 2. *Defenses*

In their traditional motion for summary judgment, Appellees asserted three defenses and contended that: (1) the economic loss rule bars Baxsto's recovery; (2) the statute of frauds bars Baxsto's fraud claims; and (3) Baxsto does not have standing to assert its fraud claims. Appellees had the burden to establish each of these defenses as a matter of law.

### a. *Economic Loss Rule*

Whether or not Baxsto's fraud claims are barred by the economic loss rule is dependent on the source of Appellees' duty to act. The economic loss rule governs the recovery of economic losses in certain areas of the law. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011). This includes the general proposition that when the economic loss is the only injury that is the subject of a contract, the cause of action sounds in contract alone. *SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 540 (Tex. App.—Eastland 2012, no pet.) (citing *Sharyland*, 354 S.W.3d at 417). In determining whether the action sounds only in contract, we

consider both the source of the defendant's duty to act—whether it arose solely from the contract or from some common-law duty—and the nature of the remedy sought by the plaintiff. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

Appellees argue that any duty imposed on them regarding the complained-of representations in this case arises only under a contract theory. But Appellees have conceded that the economic loss rule does not apply to or bar Baxsto's fraudulent inducement claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). In *Formosa Plastics*, the supreme court "reject[ed] the application of *DeLanney* to preclude tort damages in fraud cases." *Id.* The court noted that "Texas law has long imposed a duty to abstain from [fraudulently] inducing another to enter into a contract." *Id.* The duty there arose outside of the contract. *Id.* The court unequivocally held that tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed into a contract or whether the plaintiff only suffers an economic loss that is related to the subject matter of the contract. *Id.* at 47. This explains why Appellees have, understandably, conceded that Baxsto's fraudulent inducement claim is not barred and survives this appeal.

While the holding in *Formosa Plastics* is specific to fraudulent inducement, the supreme court has since expressed that it did not intend for its holding in that case to be limited in its application. In *Sharyland*, the court identifies fraud—including common law fraud and statutory fraud—and fraudulent inducement as two of the several tort causes of action for which the recovery of economic damages is allowable absent physical injury or property damage. *Sharyland*, 354 S.W.3d at 418 (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) (upholding a jury's award of lost profits for a fraud claim)); *see also* Bus. & Com. § 27.01 (authorizing actual damages for fraud in certain real estate or stock transactions); *Formosa*

*Plastics*, 960 S.W.2d at 47. The distinguishing factor in these cases appears to be where the duty lies: is the duty independent of or does it arise from a contract?

Here, in evaluating Baxsto's fraud claims, the duty arises independent of the contract regardless of whether the damages that Baxsto seeks are solely for economic losses. Thus, the duty to not commit fraud is an independent duty that is separate and distinct from any duty to comply with a contract. *Formosa Plastics*, 960 S.W.3d at 46; *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 63 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Baxsto's claim for damages is that it sold its mineral interests to Appellees for less than it would have if Baxsto had known and been advised by Appellees of the true circumstances. Baxsto relies on the well-recognized, independent duty that one must not make false statements to another to induce a binding agreement. *See Formosa Plastics*, 960 S.W.2d at 47. Appellees argue that they were not bound to act in accordance with their representations because such representations are not contractual in nature. However, whether or not the representations were tantamount to contractual agreements or were later subsumed into a contract is not pertinent to Baxsto's fraud claims because a separate and distinct duty exists that Appellees must not commit fraud. *See id.* ("[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract.").

An issue of material fact exists as to whether Baxto's fraud claims are barred by the economic loss rule. As such, the trial court erred when it granted summary judgment in favor of Appellees, to the extent that the trial court's grounds were based on this defense. Accordingly, we sustain Baxsto's third issue on appeal.

### b. *Statute of Frauds*

The statute of frauds bars a fraud claim to the extent that the plaintiff seeks to recover "benefit-of-the-bargain" damages that cannot otherwise be enforced under

the statute. *Lam v. Phuong Nguyen*, 335 S.W.3d 786, 790 (Tex. App.—Dallas 2011, pet. denied); *see also Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). The purpose of the statute of frauds is frustrated if the statute can be easily circumvented by a party who relies on a fraud claim to essentially enforce a contract that the statute deems to be unenforceable. *Haase*, 62 S.W.3d at 799. The statute of frauds does not bar a claim for fraud to the extent that a party seeks to recover reliance or "out-of-pocket" damages because such damages are not part of the benefit of the alleged bargain between the parties. *Lam*, 335 S.W.3d at 790.

Baxsto argues that the statute of frauds would not bar its fraud claims because (1) none of its fraud claims are based on an oral lease; (2) it is not seeking "benefit-of-the-bargain" damages—it seeks damages only for being fraudulently induced into selling its mineral interests at a reduced price; and (3) the representations upon which it relied do not fall within any exception to Section 26.01 of the Business and Commerce Code. *See* BUS. & COM. § 26.01 (the rule that pertains to statutory fraud in a real estate transaction setting). Conversely, Appellees contend that their alleged misrepresentations were only promises that relate to the development of the leasehold estate, the payment of bonuses, and the assignability of the mineral interests. Therefore, because these are alleged promises that relate to the lease of a mineral interest, the promises, to be enforceable under the statute of frauds, must be in writing. *See id.* § 26.01(b)(5).

In light of its pleadings, what is the measure of damages for which Baxsto seeks a recovery in this case? Baxsto does not seek to recover damages because Appellees failed to pay Baxsto the highest lease bonus, failed to develop the acreage under the lease, or because of Appellees' efforts to flip the lease. *See Lam*, 335 S.W.3d at 790–91 (fraud claims that seek "benefit-of-the-bargain" damages—the difference between the value that was represented and the value actually received—

are barred by the statute of frauds to the extent the underlying claim fails to comply with the statute.). Instead, the recovery that Baxsto seeks here is more akin to a claim for "out-of-pocket" damages—damages for being induced by Appellees to part with its mineral interests at a price that was lower than the mineral interests' true value. *See id.* (fraud claims that seek "out-of-pocket" damages—the difference between the value that was parted with and the value that was received—are not barred by the statute of frauds). Baxsto calculated and assessed a lower valuation of its mineral interests based on Appellees' representations that were made during the parties' negotiations.

An issue of material fact exists as to whether the statute of frauds bars Baxsto's fraud claims. As such, the trial court erred when it granted summary judgment in favor of Appellees, to the extent that the trial court's grounds were based on this defense. Accordingly, we sustain Baxsto's fourth issue on appeal.

c. *Standing*

Appellees had the burden to establish, as matter of law, that Baxsto does not have standing to assert its fraud claims. *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex. 1982). In their motions for summary judgment, Appellees argued that Baxsto did not have standing to sue because Baxsto conveyed its mineral interests including "all and singular the rights and appurtenances thereto in any way belonging." Appellees argued that because Baxsto did not possess any current ownership interests in the minerals, Baxsto lacked standing to bring any claims related to the lease.

Standing exists if the party bringing the lawsuit is personally aggrieved by the alleged wrong. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Baxsto's fraud claims are personal to it because it is the party to whom the alleged misrepresentations were made and the party who sold the mineral

interests. Further, the language that Appellees refer to in the lease neither releases the claims that Baxsto could assert nor acts as an assignment of Baxsto's right to assert such claims. As such, Appellees failed to meet their burden to establish Baxsto's lack of standing, and the trial court erred when it granted summary judgment in Appellees' favor, to the extent that the trial court's grounds were based on standing. Accordingly, we sustain Baxsto's fifth issue on appeal.

C. *Baxsto's Derivative Fraud Claims*

In addition to its direct fraud claims, Baxsto has asserted several derivative fraud claims against Appellees including beneficiary of fraud, civil conspiracy, constructive trust, and joint enterprise.

As an initial matter, Appellees argue that Baxsto's derivative fraud claims cannot survive summary judgment because Baxsto's underlying, direct fraud claims do not survive summary judgment. This would be true if the summary judgment evidence supported the trial court's grant of summary judgment in Appellees' favor. However, as discussed above, and as we have concluded, Appellees' no-evidence challenges fail. Moreover, Appellees have failed to meet their burden to prove that there is no genuine issue of material fact concerning the element of justifiable reliance and their defenses. Therefore, to the extent that Baxsto's derivative fraud claims are based upon the viability of its underlying fraud claims, and because Baxsto's direct fraud claims survive summary judgment, so do its derivative fraud claims.

In their second motion for summary judgment, Appellees asserted no-evidence challenges to the derivative fraud claims that Baxsto asserted against Vortus, REC, and Roxo FW. However, Appellees did not challenge the beneficiary-of-statutory-fraud claim that Baxsto asserted against Roxo. Therefore, we do not address this claim as it relates to Roxo because we cannot affirm summary judgment

on a ground that is not raised in the motion. *Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

We now address whether at least a scintilla of evidence raising a genuine issue of material fact exists as to Baxsto's other derivative fraud claims and the no-evidence challenges to these claims that Appellees have raised.

### 1. *Beneficiaries of Fraud*

First, Appellees asserted that there is no evidence that (1) REC and Roxo FW were beneficiaries of fraud and (2) Vortus, REC, and Roxo FW were beneficiaries of statutory fraud. "Texas case law has held that each party to a fraudulent scheme is responsible for the acts of the other participants [that are] done in furtherance of the scheme and [may be] liable for fraud." *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 494 (Tex. App.—Beaumont 2006, pet. denied). "A party may be held liable for fraud because he participated in the transaction and reaped the benefits." *Robertson*, 204 S.W.3d at 494. Specifically, Appellees asserted that there is no evidence that (1) Vortus, REC, and Roxo FW committed fraud, had knowledge or procurement of any fraud, or that fraud was committed with their authority or consent, (2) Roxo FW benefited from the fraud, and (3) Vortus and Roxo FW benefited from the statutory fraud.

As discussed above, Vortus, through Crumley acting as its agent, made representations during the parties' negotiations that Baxsto contends were fraudulent based on its direct fraud claims. Because we have concluded that the trial court erred when it granted summary judgment in favor of Appellees as to these claims, we need not address whether beneficiary liability applies to Vortus at this time. *See* TEX. R. APP. P. 47.1.

The summary judgment evidence shows that REC and Roxo FW participated in the parties' transactions. REC is a company that Roxo created in September 2017 to hold mineral interests. In 2017, REC was controlled by a management committee composed of Fitzgerald, Crumley, and Jeff Miller. Similarly, Roxo FW is a Vortus entity. Vortus, through Roxo FW, made a capital commitment to Roxo for funding. We have considered this summary judgment evidence, in addition to other evidence that the parties have submitted in camera pursuant to a confidentiality and protective order that further details the ownership structure of the Vortus and Roxo entities and the mineral interests held by them, and we conclude that there is at least a scintilla of evidence that raises a genuine issue of material fact regarding REC and Roxo FW's participation in these transactions.

Further, as to whether Roxo FW benefited from the alleged fraud, the summary judgment evidence supports an inference that Roxo FW benefited from an increase in the value of its equity after the leasehold interest was sold.[4] Like above, this summary judgment evidence was produced in camera pursuant to the parties' confidentiality and protective order and includes information concerning the ownership structure of the Vortus and Roxo entities and the mineral interests held by them. We have considered this summary judgment evidence in the light most favorable to Baxsto and we conclude that there is a at least scintilla of evidence that

---

[4]Appellees argue that the evidence identified by Baxsto pertains only to REC or Vortus and that Roxo FW's ownership interest is no evidence that Roxo FW directly benefited from the alleged fraud. This evidence primarily refers to actions taken by REC because REC was the entity that held the mineral interests that were leased. However, evidence submitted in camera pursuant to the parties' confidentiality and protective order details the ownership structure of these entities and shows that while REC was the actor that held and sold the mineral interests, Roxo FW possessed an ownership interest in the minerals and realized an increase in the value of its ownership interest as a result of the sale. Thus, the evidence supports the inference that Roxo FW benefited because of these actions. *See Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 198 (Tex. App.—San Antonio 1991, no writ) ("It is also well settled in Texas, that '[i]nferences may be drawn from actual facts proved.'" (alteration in original) (quoting *Beazley v. McEver*, 238 S.W. 949, 952 (Tex. App.—Dallas 1922, no writ))).

raises a genuine issue of material fact regarding whether Roxo FW received a benefit.

### 2. *Civil Conspiracy*

Appellees raised a no-evidence challenge to all elements of the civil conspiracy claim that Baxsto asserted against Vortus, REC, and Roxo FW. To prove a claim for civil conspiracy, one must show: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). Civil conspiracy requires that an underlying tort caused the claimant's damages. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

The summary judgment evidence shows that Crumley, as a representative of Vortus, REC, and Roxo FW, and Fitzgerald, as a representative of Roxo and REC, sought to lease and otherwise obtain mineral interests in the area for the purpose of gaining (1) operational control in the acreage and (2) ownership of mineral interests owned by Baxsto and others. While pursuing this course of action, Crumley and Fitzgerald made representations that Baxsto has alleged were fraudulent, namely, that Appellees' actions resulted in Baxsto selling its mineral interests for "half of what their value would have been absent the fraud." As we have discussed above, the fraudulent nature of these representations raises at least a genuine issue of material fact. We have reviewed the summary judgment evidence in the light most favorable to Baxsto and we conclude that there is at least a scintilla of evidence that raises a genuine issue of material fact that Vortus, REC, and Roxo FW participated in a civil conspiracy as alleged.

### 3. *Constructive Trust*

Generally, three elements are required to impose a constructive trust: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced to the original party. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). In their no-evidence challenge, Appellees asserted that there is no evidence regarding the first two elements stated above.

Baxsto asserts, on appeal, that it seeks to impose a constructive trust based only on its fraud claims, and that the summary judgment evidence amply supports its claims. The imposition of a constructive trust is a remedy for fraud, not an alternative cause of action. *Kinsel v. Lindsey*, 526 S.W.3d 411, 425 (Tex. 2017). As we have said, Baxsto's summary judgment evidence supports the arguments it has raised that (1) it sold its mineral interests for half of its potential value due to Appellees' alleged fraudulent conduct and (2) Appellees sold the leasehold interest to a third party in 2018 and realized a profit. We have reviewed the summary judgment evidence in the light most favorable to Baxsto and we conclude that there is at least a scintilla of evidence that raises a genuine issue of material fact regarding the two elements of Baxsto's constructive trust claim that Appellees challenged.

### 4. *Joint Enterprise*

Finally, Baxsto asserts, alternatively, that to the extent Vortus and Roxo FW were not directly liable to Baxsto, they were vicariously liable under the theory of joint enterprise. Joint enterprise is not an independent tort claim; rather, it is a claim for vicarious liability for an underlying tort. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000). A joint enterprise makes each party responsible for the conduct of others when there is "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group;

(3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.*; *see also Motloch v. Albuquerque Tortilla Co.*, 454 S.W.3d 30, 35 (Tex. App.—Eastland 2014, no pet.).

Appellees asserted no-evidence challenges to the third and fourth elements of Baxsto's joint enterprise claim. In response to the third element challenge, Baxsto submitted summary judgment evidence that Vortus and Roxo FW were capital partners for the lease and conveyance of Baxsto's mineral interests. Further, the lease and conveyance were significant aspects of Appellees' strategy of gaining operational control in the area. We conclude that there is at least a scintilla of evidence that raises a genuine issue of material of fact regarding whether Vortus and Roxo FW were engaged in a community of pecuniary interest in the purpose of the joint enterprise, i.e., the pursuit of Baxsto's mineral interests. *See Able*, 35 S.W.3d at 614 (finding a pecuniary interest in a common purpose where the project involved substantial sums of money, a sharing of resources in order to make better use of this money, and the potential for an economic gain).

In response to Appellees' fourth element challenge, Baxsto submitted summary judgment evidence that Vortus represented the interest of Roxo FW during Appellees' ongoing negotiations with Baxsto. Roxo and Vortus specifically created REC to receive and hold Baxsto's mineral interests after the sale. Thereafter, REC was jointly controlled by a management committee that included Fitzgerald, who was an agent of the Roxo entities, and Crumley, who was an agent of the Vortus entities. We conclude that at least a scintilla of evidence that raises a genuine issue of material fact exists as to whether Vortus and Roxo FW had an equal right and voice in the direction, control, and management of the enterprise. *See Able*, 35 S.W.3d at 616 ("even though Metro employees carried out the procedures of the

46

Transitway Management Team, TxDOT had an equal right to control what those procedures were and how they were to be carried out").

Because at least a scintilla of summary judgment evidence for each of the challenged elements of Baxsto's derivative fraud claims exists, genuine issues of material fact remain. As such, the trial court erred when it granted summary judgment in favor of Appellees on these claims, to the extent that the trial court's grounds were based on Appellees' challenges to Baxsto's derivative fraud claims. Accordingly, we sustain Baxsto's sixth issue on appeal.

## VI. *This Court's Ruling*

We reverse the trial court's judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

W. STACY TROTTER
JUSTICE

April 20, 2023
Panel consists of: Bailey, C.J.,
Trotter, J., and Wright, S.C.J.[5]

Williams, J., not participating.

---

[5]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, Eleventh District of Texas at Eastland, sitting by assignment.